594 A.2d 682

**Joseph R. BARRON**

v.

**Margaret T. BARRON, Appellant.**

Superior Court of Pennsylvania.

Argued June 13, 1991.

Filed July 15, 1991.

Donald J. Martin, Norristown, for appellant.

John D. Conroy, Doylestown, for appellee.

Before MONTEMURO, BECK and CERCONE, JJ.

MONTEMURO, Judge:

Appellant, Margaret T. Barron, ("mother") appeals from a custody order in this action brought by appellee, Joseph R. Barron ("father") for custody of the parties' daughter, Christine. We remand for further proceedings.

The parties were married on July 3, 1971 and separated on June 13, 1990. Christine, their only child, was born on December 26, 1984. Following a hearing, the trial court granted joint legal custody in both parents. The order provides that father is to have primary physical custody of Christine during the school year; during this period, mother has partial physical custody every other weekend, from 9:00 a.m. Saturday until 8:00 p.m. Sunday, and every Wednesday evening from 6:00 to 8:00. During the summer, mother is to have primary physical custody of Christine from the time school lets out until August 1st, while father has partial custody every other weekend during this period. Each parent has an uninterrupted two-week period of vacation with Christine each year. The custody order also sets forth a holiday schedule by which each parent has Christine on three holidays per year; in addition, the parents alternate between Christmas Eve and Christmas day from year to year.

On appeal, mother argues that the factual findings of the trial court are unsupported by the record. Mother seeks a remand of the case for further development of the record, specifically for a determination of the extent of father's "alleged drinking problem" and its effect on Christine, and for a determination of the effect of mother's lesbian relationship on Christine.

Our primary concern in this case, as in all custody cases, is that the best interests of the child be served.

"(O)ur law has long recognized that the scope of review of an appellate court reviewing a custody matter is of the broadest type ... Thus, an appellate court is not bound by deductions or inferences made by a trial court from the facts found; ... nor must a reviewing court accept a finding which has no competent evidence to support it ...

\* \* \* \* \* \*

However, we have also taken great care to stress:

'... (T)his broader power of review was never intended to mean that an appellate court is free to nullify the factfinding function of the hearing judge ...'

\* \* \* \* \* \*

(but, instead is to remain) within the proper bounds of its review and (base a decision) upon its own independent deductions and inferences *from the facts as found by the hearing judge.* (Citations omitted; emphasis added.)."

\* \* \* \* \* \*

" '(W)e have recognized that the trial judge is in a position to evaluate the attitude, sincerity, credibility, and demeanor of the witness. Because we are not in such a position, we have recognized that a trial judge's determination of custody should be accorded great weight. *Only where we are constrained to hold that there was a gross abuse of discretion should an appellate court interfere with the decisions of the hearing judge ...*' (Citation omitted; emphasis added.)."

*Commonwealth ex rel. Robinson v. Robinson,* 505 Pa. 226, 236, 478 A.2d 800, 806 (1984), *quoting Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 295–96, 368 A.2d 635, 637 (1977). *See also Lombardo v. Lombardo,* 515 Pa. 139, 147, 527 A.2d 525, 529 (1987).

At trial, both parties presented testimony on their lifestyles, past and present, and their involvement with Christine. The parties had been married for nineteen years prior to their separation. Mother had moved out of the family home six weeks before the trial which was held on July 30, 1990. Between the initial date of separation and the time of trial, the parties had been sharing physical custody of Christine, with each having custody on alternate weeks.

Father lives in a working-class neighborhood in Levittown in the marital residence previously shared by the parties. N.T. July 30, 1990 at 3. For the past 15 years, he has worked as a painting supervisor at a firm located in Feasterville roughly seven miles from his home; his hours are 8:00 a.m. to 4:30 p.m., and thus he is available during the

evenings and weekends to care for Christine. *Id.* at 4–5. As of the time of the hearing, Christine was scheduled to begin kindergarten in the upcoming fall of 1990. Father had arranged for a longtime friend of the family, Linda Crosby, to provide child care during the hours that father is working and Christine is not at school, including escorting the child to the dance classes in which Christine has been enrolled for three years. *Id.* at 9, 14. In the event Ms. Crosby is unavailable to baby-sit, Ms. Crosby's husband Bob or sixteen-year-old daughter Bernadette will fill in for her. In fact, the Crosbys had already done some babysitting for father during those weeks before trial in which father had custody of Christine. Linda Crosby testified at the trial and concurred in father's testimony as to the child care arrangement; Bob Crosby also testified and indicated that he was supportive of the arrangement.

Father shares numerous activities with Christine, including bike-riding, swimming, fishing, camping, and walks to the park. *Id.* at 11. Mother's mother and siblings have homes near father's neighborhood; father testified that he is very supportive of Christine continuing her relationship with her maternal relatives. Father characterized his relationship with Christine as "very close." *Id.* at 13. He described the child as somewhat confused by mother and father's recent separation.

On cross-examination, father testified that mother was the primary caretaker of the child prior to the separation.

Mother testified that six weeks before the trial she had moved out of the marital residence to a duplex in Clark, New Jersey, a residential suburb of Edison, New Jersey; her new home is approximately an hour drive away from Levittown. Mother shares her new home with her lesbian partner, Ms. Sally Bell, and Ms. Bell's seven year old daughter, Meghan. Although Sally Bell had been living in the Clark area prior to mother's moving there, mother stated that her primary reason for moving to Clark was the prospect of a good job, as she had formerly held a good-paying management position with a firm in that area before

she had given birth to Christine. Her former employer had expressed an interest in rehiring her when Christine starts first grade. In the meantime, mother works as a cashier at a foodstore during the evenings from 7:00 p.m. to 11:00 p.m. As the store is located directly across the street from her home, mother comes home during her nine o'clock break to put Christine to bed. Mother's partner, Sally, cares for Christine when mother is working, and mother cares for Christine and Sally's child Meghan while Sally is at work during the day. This child care arrangement had been in effect during the weeks in which mother had Christine since the parties had separated in June of 1990. Mother planned to send Christine to the local kindergarten in the upcoming fall and in fact had applied to work as an assistant teacher in the kindergarten, in addition to her job as a cashier. Mother had investigated the school that Christine would be attending if she lived primarily with mother and reported that the school was ranked very high nationally for academics. Mother had also located a local dance academy equivalent to the dancing school which Christine attended in Levittown.

Mother and Sally Bell take the children to local parks and playgrounds, as well as swimming, fishing and rollerskating. As of the July, 1990 hearing, mother had been romantically involved with Ms. Bell for four to five months, although Ms. Bell had been friendly with mother and father for about eight years, as Ms. Bell's parents were friends and neighbors of mother and father in Levittown. N.T. July 30, 1990 at 44–47.

Mother testified that Christine was unaware of the nature of the relationship between mother and Ms. Bell, as mother and Sally Bell were not open about their relationship with Christine, they were not publicly affectionate and the sleeping arrangements were such that mother had her own bedroom set up in the new home. Mother testified that although she spends the night with Sally, the children are in bed asleep by the time mother goes to bed around midnight, and mother is up early in the morning before Christine

wakes up. Mother opined that she would not want her daughter to develop a lesbian lifestyle, although she would be supportive if Christine chose such a lifestyle as an adult. *Id.* at 50, 56. Mother stated that after the custody issue was resolved, she intended to take Christine to a psychologist for assistance in determining the proper time for, and way of, explaining her lifestyle to Christine. *Id.* at 53. Mother decided to wait until Christine's life stabilizes in terms of mother and father separating and getting divorced before broaching the topic of mother's lifestyle. Mother noted that as a five year old child, Christine's knowledge of adult relationships, be they heterosexual or homosexual, is very limited. *Id.* at 62.

Sally Bell testified that she works as an air-conditioning/refrigeration engineer at the University of Medicine and Dentistry, located an approximate twenty minute ride away from home. Her description of a typical day with Christine, Meghan and mother was consistent with mother's testimony regarding the child care arrangement, the work schedules and the activities shared with the girls. She testified that she had known and socialized with mother and father for about seven years, as mother and father were friends and neighbors of Sally's mother. *Id.* at 110–111. Sally described her own daughter as a straight-A student who is well adjusted socially. Sally noted that she is not openly gay in the community, and indicated that she would not want her daughter, Meghan, to opt for a lesbian lifestyle. Sally's testimony was consistent with mother's testimony to the effect that they are not openly affectionate with each other beyond the usual kiss and hug associated with hello and good-bye. Sally indicated that she and mother had discussed that right now was not the appropriate time to try to make Christine understand lesbianism and mother's relationship with Sally. Sally also testified that she had told her own daughter not to discuss the topic with Christine.

Several witnesses testified as to father's drinking habits. Mother testified that father drinks "constantly" when he is

not working and becomes nasty and belligerent when he drinks. *Id.* at 66–67. When drunk, he has become verbally abusive to mother in front of Christine and their friends. Mother testified that there have been some evenings in which father drank in front of Christine, and had even passed out from drinking when mother was at work and the child was still up. *Id.* at 67. On one occasion, father's brother tried to reach father by phone and Christine answered, reporting that she could not awaken father. Christine's maternal grandmother and aunt who lived nearby were contacted by the brother, and they hurried over to the house to stay with Christine until mother returned home from work. At other times during which father had been drinking, friends and neighbors have stayed in the home with Christine until mother returned home from work. Mother also testified that Christine has witnessed father rip doors off their hinges and punch holes in the wall while he was drunk. *Id.* at 101–102.

Ms. Patricia Chewning, mother's sister, was called to the stand and testified that she lives in Bristol, a five minute ride away from the parties' home in Levittown. Ms. Chewning recalled that she had attended a Fourth of July picnic at father's house a few weeks before the trial; everybody was drinking at the picnic. After most of the guests had left, Ms. Chewning and the few remaining guests discovered that father had drunk so much that he fell asleep on the back patio with the house wide open and could not be awakened. Christine was in a bedroom asleep. Ms. Chewning remained in the home until her friend finally managed to wake father up, at which point father ordered them out of his house. Ms. Chewning also testified that she has seen father fall asleep at the kitchen table on three or four other occasions after drinking, although mother was in the home those times. On cross-examination, Ms. Chewning described father's relationship with Christine as "obsessive" in that father buys her anything she wants. She further stated that mother disciplines Christine, whereas

father permits Christine to "get away with everything." *Id.* at 145.

Mr. William M. Schulz, Christine's godfather, testified that he grew up with mother and had been friends with father since mother and father started dating before their marriage. Mr. Schulz and his wife are very good friends with mother and father and the two families have vacationed and socialized extensively together. Mr. Schulz testified that over the years, he has witnessed father drink to the extent that father fell asleep on several occasions, he has seen father drinking in front of Christine "very often," and has seen father drive after having some alcohol. *Id.* at 150. Mr. Schulz stated that father is a very caring father, but is excessive to the point where he dotes constantly on Christine and buys her expensive gifts. Mr. Schulz concurred in Ms. Chewning's opinion that mother is the disciplinarian, whereas father is not. *Id.* at 151.

Mr. Schulz' wife, Debra Schulz, testified at trial that she has seen father drink excessively at times in front of Christine, the last time being at Christine's birthday party approximately six months before the hearing. On that occasion, father had gotten so obnoxious that several guests left. Mrs. Schulz also testified that she had personally witnessed father drinking while driving, and that Christine has been with him on those occasions. *Id.* at 159. Mrs. Schulz stated that she had met Sally Bell and Sally's daughter whom she described as a polite, well-adjusted child.

Ms. Margaret Tomlinson, mother's mother, testified that she had attended numerous social functions at the home of mother and father. Ms. Tomlinson described father as "[a]t times a heavy drinker." *Id.* at 164. She stated that she had also seen father drink so much that he had fallen asleep, although mother was there on those occasions. Ms. Tomlinson related the same story that mother had told of the time when father's brother had telephoned and Christine was unable to rouse father, so Ms. Tomlinson and her daughter went to the home to watch Christine until mother returned from work.

On rebuttal, father testified that he had never missed a day of work due to drunkenness or a hang-over. Although father admitted that he had drunk excessively at parties, he stated that he did not think he had a drinking problem, that he could go without drinking, and that if he got custody he would probably stop drinking altogether.

Mother challenges the trial court's decision to award primary physical custody to father, arguing that the trial court's findings are unsupported by the record. In entering the custody award, the trial court stated:

... I have concerns on both sides. I do think Father has some drinking problems on occasion.

However, I'm more concerned I think with Christine's psychological well-being at this point. Her parents have just separated ... And I was extremely unimpressed, I must say, by Sally Bell. Not Sally Bell because per se of her lifestyle. This particular individual. And I'd like to emphasize that. Whatever her sexual preference would have been, if she were a man on the stand, I would have been concerned.

At this point, given my various concerns, I am going to opt for what I perceive as the status quo and basically keep the child in Levittown. ... The order I'm entering is specifically under the present circumstances that mother is living in Clark, New Jersey, with Sally Bell. If that changes in the future, that would specifically be considered.

Order of Court, July 30, 1990 at 2. The court then entered the custody order summarized above.

Mother claims that a remand is necessary because the trial court's credibility determination relative to father's drinking habits was unsupported by the record. We agree.

In its opinion in support of its order, the court stated that she found father's testimony regarding his drinking more credible than mother's testimony because mother testified that she does not drink alcoholic beverages at all. We have carefully reviewed the entire transcript of the hearing, line

by line, and must conclude that the trial court's characterization of mother's testimony is erroneous. Mother was never questioned about her own drinking habits on either direct or cross-examination, and therefore never even testified as to the matter. In fact, mother's own witnesses testified that mother was a light drinker. Thus, we conclude that the trial court grossly abused its discretion in concluding that father's testimony was more worthy of belief.

We are also deeply troubled by the trial court's utter failure to address the effect of father's drinking on his ability to provide adequate care for Christine. In addition to mother's testimony, father's own friends testified that father was prone to drink intoxicating beverages to the point of getting verbally abusive or falling asleep. The trial court failed to address the issue, beyond duly noting that father "has some drinking problems on occasion." We do not understand why the court did not perceive this as a significant factor in determining whether Christine's interests would be best served by living primarily with mother or with father. Although much of the drinking took place in the company of friends in the context of social settings, there was uncontradicted testimony that the excessive drinking went on in the child's presence and on at least two occasions father had passed out when he was the sole caretaker of Christine. Fortunately for the child, there was a strong support system of relatives and neighbors who were able to compensate for father's failure to act in a manner appropriate to one charged with the care of a five-year old child. The fact that father has never missed work nor been arrested for drunken driving or some other alcohol-related behavior is not the determinative factor. In *Commonwealth ex rel. McNamee v. Jackson,* 183 Pa.Super. 522, 132 A.2d 396 (1957), this Court reversed an order awarding a father custody of his children where the testimony of four witnesses showed that the father drank excessively and was very intoxicated on numerous occasions. The Court stated:

The trial court may have been justified in finding that 'the evidence does not indicate that he is an alcoholic,' but it was not justified in ignoring the overwhelming weight of the evidence establishing that he did drink intoxicating beverages to excess a number of times, including occasions when his children were present.

*Id.*, 183 Pa.Superior Ct. at 528, 132 A.2d at 399. Similarly, given the testimony in this case, we find that the trial court abused its discretion in fashioning the custody award without due regard to father's drinking habits. We therefore remand the case for a reconsideration of the custody order.

 Mother further argues that the trial court erred in concluding that it would not be in Christine's best interest to be around Sally Bell on a full-time basis. Initially, we note that the trial court did not rest its finding on the basis of mother's lesbian relationship with Sally. The trial court properly recognized that under our caselaw, the burden is on the parent who is involved in a gay relationship to prove that there will be no adverse effect on the child if exposed to the relationship. *Pascarella v. Pascarella*, 355 Pa.Super. 5, 512 A.2d 715 (1986); *Constant A. v. Paul C. A.*, 344 Pa.Super. 49, 496 A.2d 1 (1985). After hearing all of the evidence, the trial court held that in this case, mother's lifestyle did not "create any impediment to the creation of a loving, caring environment" for Christine or render mother unfit for custody.[1] Trial Court Opinion, February 1, 1990 at 4. Instead, the court found that mother's particular partner, Sally, would have a negative impact on Christine.

The court explained that she perceived Sally as hostile to father. This determination falls within the discretion of the trial court, as the trial court is in the unique position to evaluate the attitude and demeanor of the witness. We therefore will not disturb this finding.

---

1. This determination is reflected in the particulars of the custody order. Unlike the homosexual parents in *Pascarella* and *Constant A.*, overnight visits with mother are permitted every other weekend, and mother has primary physical custody of Christine throughout the summer months.

The court also indicated that she believed that Sally had isolated mother from her family and friends because none of the friends or relatives who testified on mother's behalf had visited mother in her new home. This latter finding does appear unreasonable insofar as mother and Sally had only been living in the new home for six weeks, the new home was an hour-long drive from the old neighborhood, and there is nothing in the record to support the conclusion that Sally created an environment in which these people felt unwelcome. In fact, Mrs. Schulz testified that she was aware of the nature of mother's relationship with Sally; that she had met Sally occasionally at father's home; that as Christine's godmother, she was not at all concerned about Christine living in a household with Sally; that she had met Sally's daughter and described her as intelligent, polite and well-adjusted; and that she believes that if Christine is brought up in the same environment, Christine will have no problem. Ms. Tomlinson testified that although she had not yet been to mother's new home, she had seen mother and Christine every other week since the separation, as mother had stopped by her mother's home with Christine for visits. Mr. Schulz testified that he had helped mother move out of the Levittown home; although he stated that he had not been to her new home since the move, he also stated that he had not been to father's house since the separation. *Id.* at 148. Although the court's conclusion that Sally has created an unwelcome environment is not supported by the testimony, a careful reading of the trial court opinion shows that this factor was but one of the many considerations which the court weighed in reaching its determination. We are convinced that this factor alone was not determinative of the court's resolution of the custody question.

On remand, the trial court should make specific findings as to father's drinking habits, his attitude thereto, and the resultant danger to the child, and order the appropriate intervention. The court should re-evaluate the custody

order in view of its findings, and depending upon its conclusions, either alter or confirm the order.

Remanded for further proceedings. Jurisdiction relinquished.