617 A.2d 31

**Beth BLEW, Appellant,**

v.

**Bennett VERTA.**

Superior Court of Pennsylvania.

Argued Aug. 25, 1992.

Filed Dec. 3, 1992.

Anne P. Felker, Bethlehem, for appellant.

Richard J. Shiroff, Easton, for appellee.

Before BECK, JOHNSON and HOFFMAN, JJ.

BECK, Judge.

This case involves the discretion of the trial court to restrict the partial custody arrangement of a lesbian mother to visit with her 8–year old son Nicholas. The trial court's order restricted the mother's custody, prohibiting her from visiting her son in the presence of her female partner. Mother filed this timely appeal. We find that the trial court abused its discretion in entering the order appealed from, and we reverse.

In 1983, during the parties' marriage, Nicholas was born. The parties were divorced in 1987. Upon agreement in 1990, the court entered a custody order awarding shared custody of Nicholas to mother and father. The order provided that Nicholas be placed in the primary physical custody of father. Mother was given partial custody every other weekend during the school year and the majority of Nicholas' summer vacation. Father also had Nicholas for four weeks during the summer.

The parties operated under this order for several months. On mother's weekends she picked up Nicholas at father's home and drove him to the home she shares with Sandy E., a trip that takes three hours. At the end of the weekend father picked up Nicholas at his mother's house and returned to his own.

In April, 1991, shortly after Nicholas had arrived at mother's home for weekend visitation, she noticed that Nicholas had bruises on his body. Nicholas first told her that he had fallen, then later told her that his stepmother had hit him.

When father and his wife picked up Nicholas at the end of the visitation, mother confronted father with her observation, and he admitted that Nicholas had been spanked prior to leaving father's home.

Mother filed a petition for special relief with the court, alleging abuse of Nicholas by his father and stepmother. A hearing was held at which mother, father, and Nicholas testified. Nicholas testified that his stepmother "hit [him] with a belt" on his backside for making a rude gesture to his school bus driver, and that she had used a belt on him on prior occasions. R.R. 343A. Father testified that he and his wife believed in using spanking as a form of discipline. R.R. 331A. Finding that the evidence presented did not warrant granting emergency relief, the court denied mother's petition. However, the court suggested to mother that if she wanted, she should file a petition to modify custody. She did, alleging physical abuse and psychological mistreatment of Nicholas.

Father countered with a petition for special relief and for modification of the custody order, alleging that mother's lesbian relationship was detrimental to Nicholas. At the hearing, mother testified, as did her parents, her partner, Sandy E. and a neighbor. In addition, father and his wife testified. Father's expert was Dr. Harold Pascal, a psychiatrist who had examined Nicholas. Mother's expert was Delores Kristofits, a psychologist who had examined Nicholas and mother's partner, Sandy E., and who supervised the examination of mother by another psychologist in her office. The evidence adduced at trial related to Nicholas' relationship with his parents and their respective partners, his interaction with his father's and stepmother's twins, and his grandparents. Testimony was also admitted about Nicholas' activities at both his mother's and father's houses. The judge also interviewed Nicholas in chambers.

The court modified the prior custody order. The new order changed the existing custody arrangement in three ways. First, the court provided that mother was required to exercise her weekend custody of Nicholas at the home of mother's parents, rather than in her own home. Second, the court

prohibited any contact between Nicholas and mother's partner, Sandy E., during any part of mother's custody period. Third, mother's extensive period of summer custody was reduced to two weeks, and made subject to the terms and conditions of mother's regular custody, *i.e.,* to be exercised in her parents' home and without Sandy E.

Mother first claims that the trial court committed an abuse of discretion in concluding that Nicholas has been harmed by exposure to her lesbian relationship. We agree with mother.

Our scope of review is settled:

The scope of review of an appellate court reviewing a child custody order is of the broadest type; the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. *Commonwealth ex rel. Robinson v. Robinson,* 505 Pa. 226, 478 A.2d 800 (1984); *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977) (plurality). However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. *Lombardo v. Lombardo,* 515 Pa. 139, 527 A.2d 525, 529 (1987). Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845, 847 (1992).

In carefully reviewing the entire record, we find that the trial court's conclusion that Nicholas has been harmed by his mother's lesbian relationship is not supported by its own findings of fact and therefore represents a gross abuse of discretion.

—Trial Court's Findings—

We summarize the relevant testimony from the hearing

which was held over a two-day period.[1]

Nicholas' father testified that he and his wife first became concerned about Nicholas following three incidents occurring in March, 1991. One incident involved Nicholas' plunging lead weights into the throats of the six-month old twins [Nicholas' half-siblings] in his father's house. The second was Nicholas' smashing the boy twin in the face. The third involved Nicholas' violently pulling the leg of one of the twins. Trial Ct. Op., p. 5. Father claimed that when he questioned Nicholas about his behavior, Nicholas told him that his mother, Sandy E., and his maternal grandmother had told him to hurt the babies. Father further stated that Nicholas told him that these people [mother, Sandy E., and the maternal grandmother] always watched him when he went to the bathroom. *Ibid.*

Father took Nicholas to Dr. Harold Pascal. Dr. Pascal testified at the hearing that Nicholas repeated to him the accusations against his mother, grandmother, and Sandy E. that he had communicated to his father. Additionally, Dr. Pascal testified that Nicholas told him that he was embarrassed when his mother and Sandy kiss and hold hands in public, and when people laugh and make fun of them. Nicholas also told Dr. Pascal that his mother and Sandy played a game one time where they sandwiched him between them and wiggled, which embarrassed him. Trial Ct.Op., p. 3.

Dr. Pascal stated that he believed the allegations against mother. Dr. Pascal stated his opinion that these actions had caused Nicholas to become confused, angry, embarrassed and disjointed in his thought patterns. Based on these allegations, Dr. Pascal was of the opinion that mother should be permitted only supervised custody of Nicholas. *Ibid.*

1. In a custody case, the trial court is directed to set forth as clearly as possible its findings of fact, the evidence of record that supports them, the conclusions it draws therefrom, and its reasoning as to how those conclusions support the order ultimately entered. *Commonwealth ex rel. Mary Ann S. v. Daniel S.*, 278 Pa.Super. 577, 420 A.2d 692 (1980). Although the court's opinion here falls short of this standard, it is sufficiently comprehensive to permit us to exercise review of its conclusion that mother's custody should be restricted.

In contrast, Ms. Kristofits, the psychologist who had examined Nicholas, did not believe that any of the misbehavior attributed to mother and her partner had in fact occurred. She stated her view that Nicholas' acting-out was related to the conflict in his family and issues surrounding the divorce, rather than to his mother's lesbianism. The trial court stated:

Dolores Kristofits pointed out that Nicholas never told her about any events which took place in his mother's home or while he was with her which upset him. He told her that it was not true that his mom and Sandy make him do bad things. She found him to be a very angry boy but not out of hand. She attributed Nicholas' anger to several factors which included his exposure to arguments between mother and father, unfair comments concerning his mother made by his father and by children on the school bus. She also attributed some of his anger to traveling the long distance to his mother's home and back again. She opined that the mother's lesbian relationship was not the cause of Nicholas' anger and confusion. She found that the mother and Sandy had good parenting skills and no major personality problems.

Trial Ct.Op., p. 4. Ms. Kristofits stated that she did not agree that mother's custody should be cut back or restricted; she urged, if anything, that mother's custody be expanded. R.R. 136A.

Mother and Sandy E. both testified, denying the allegations against them. Mother denied that she and Sandy E. demonstrate affection for each other in public, but stated that they do kiss and hold hands in the privacy of their home. Trial Ct.Op., p. 6.

The trial judge interviewed Nicholas in chambers and found him to be very intelligent and articulate. Nicholas told the judge that he wants to spend time with both parents. He said he likes Sandy and enjoys being at her home. He said that people laugh and point at mother and Sandy when he is out in public with them, that he tries to ignore this but does not understand it. He also stated that he does not like the long car ride to his mother's house. Trial Ct.Op., pp. 4–5.

At the conclusion of the two days of hearing, the trial judge stated that he did not believe any of the allegations against mother and Sandy E. that formed the basis of the father's petition for modification. As to the issue of whether mother's homosexuality was harmful to Nicholas, the court stated that,

> Essentially, what this case comes down to and what I have to think about very carefully is whether the mother's lifestyle is a factor that may impact adversely on him. *There is no credible evidence, that I've heard in these proceedings, that persuades me that it is having an adverse effect on him.*

N.T., p. 290–91 (emphasis added).

In its opinion, the trial court repeated its belief that neither mother nor Sandy E. had done anything inappropriate toward Nicholas, and that the boy was telling lies about them to his father and stepmother out of a sense of confusion and torn loyalties:

> Nicholas, in our view, lied to us, Dr. Pascal and his parents about many things. We believe his lying reflects his confusion. . . . When he is with his father and stepmother he tells them things about Beth which he thinks they want to hear. He is clever enough to put a 'spin' on the story to make it appear she is abusing him and thereby ingratiate himself to his father and stepmother. When he is with his mother he tells her exaggerated stories about his father, e.g., the physical abuse, for the same reason.

> We found improbable and contrived [Nicholas'] stories about his mother, Sandy and the grandmother watching him in the bathroom and telling him to harm the twins. . . . We believe the testimony of the Mother, Sandy and Mrs. B. that they never said what Nicholas attributed to them and these things did not happen in the way Nicholas said.

Trial Ct.Op., pp. 9–10. The court also found no credible expert testimony supporting a finding that mother's homosexuality was harmful to Nicholas:

> Because Dr. Pascal's opinion as to the cause of Nicholas' confused and disruptive conduct was based primarily on

Nicholas' false accusations about his mother, we do not give it any weight.

*Nicholas' evaluation by Dolores' Kristofits, the psychologist, on the other hand, was based on statements and a history from Nicholas which comports with what the Court believes are the true facts.* Apparently this witness gained Nicholas' confidence and he told her the truth and his true feelings.

Trial Court Op., pp. 9–10 (emphasis added).

However, despite crediting Ms. Kristofits, the court decided not to accept her recommendation that mother's custody not be restricted, but be expanded. The court stated that this recommendation did not give proper weight to Kristofits' other findings "that Nicholas is angry about how people talk about his mother and Sandy E.," and that Nicholas dislikes the three-hour ride to his mother's house in Centre County. Trial Ct.Op., p. 10.

—Trial Court's Order—

Based on this record, we find that the trial court abused its discretion in concluding that Nicholas has been harmed by his mother's lesbian relationship. There is simply no evidence in the record of a causal link between the mother's homosexuality and Nicholas' acting-out behavior. Of the expert testimony presented, the court specifically found to be credible the testimony of Ms. Kristofits, who stated that the mother's lesbian relationship was *not* the cause of Nicholas' disturbed behavior and recommended that mother's custody be expanded. Trial Ct.Op., p. 4. The court specifically rejected the opposing opinion of Dr. Pascal as being based on falsehoods told by a child put in the middle of the conflict between his parents. *Ibid.*

The trial court advances two reasons for restricting mother's partial custody to visits at her parents' home not in the presence of Sandy E. The trial court stated that Nicholas is angry that people make fun of his mother and her partner, and that he dislikes the three-hour ride between his parents' homes. Neither reason supports the type of restriction imposed by the court. As to the car ride, we note that both

parents are established in the communities in which they live and are not likely to move. In the context of the general efforts children and parents must exert to remain in contact with each other after a divorce, we do not find the car ride described here, undertaken every other weekend, to be excessive.

 Of greater concern is the trial court's rationale relating to the mother's lesbianism. The trial judge is appropriately sensitive to the fact that Nicholas is embarrassed, confused and angry over other people's reactions to his mother and Sandy E.'s relationship. However, the merits of a custody arrangement ought not to depend upon *other people's* reactions. Would a court restrict a handicapped parent's custody because *other people* made remarks about the handicapped parent which embarrassed, confused and angered the child? We think not. The trial court's conclusion is based on an overly broad reading of *Constant A. v. Paul C.A.*, 344 Pa.Super. 49, 496 A.2d 1 (1985). *Constant A.* holds that where a parent's homosexual relationship (or, in fact, any non-marital relationship) causes harm to a child in the parent's custody, the relationship may be the basis for restricting or limiting the custody of that parent. *Accord, Barron v. Barron,* 406 Pa.Super. 401, 594 A.2d 682 (1991); *Pascarella v. Pascarella,* 355 Pa.Super. 5, 512 A.2d 715 (1986). In the instant case, however, the trial court based a finding of detriment not on the mother's homosexual relationship itself but rather on other individuals reaction to the mother's relationship.

 We find a close analogy in *In re Custody of Temos,* 304 Pa.Super. 82, 450 A.2d 111 (1982), which involved an inter-racial home. This court held that custody should not be restricted because a child may be exposed to the hostile reactions of others. We reversed the trial court's denial of custody to a parent living in an inter-racial relationship. We reiterate today what we said there:

A court may not assume that because children will encounter prejudice in one parent's custody, their best interests will be served by giving them to the other parent. If the children are taunted and hurt because they live with a black

man, with love and help they may surmount their hurt and grow up strong and decent—the sort of children any parent would be proud of.... [A] court must never *yield* to prejudice because it cannot *prevent* prejudice. Let the court know that prejudice will condemn its award, [still] it must not trim its sails.

304 Pa.Super. 82, 100, 450 A.2d 111, 120 (emphasis in original). The trial court described Nicholas' anger and confusion when he perceives outsiders ridiculing his mother and Sandy E. The solution, however, is not to penalize Nicholas further by restricting his contact with his mother and prohibiting him from spending time with her and Sandy E. in her own home. The standard "best interest of the child" requires us to consider the full panoply of a child's physical, emotional, and spiritual well-being. *Barron v. Barron, supra.* Of primary importance to the child's well-being is the child's full and realistic knowledge of his parents, except where it can be shown that exposure to the parent is harmful to the child:

Courts ought not to impose restrictions which unnecessarily shield children from the true nature of their parents unless it can be shown that some detrimental impact will flow from the specific behavior of the parent. The process of children's maturation requires that they view and evaluate their parents in the bright light of reality. Children who learn their parents' weaknesses and strengths may be able better to shape lifelong relationships with them.... [I]t is preferable for parent-child relationships to be defined by and developed according to the personalities and character of the child and parents, unhampered, to the extent possible, by restrictions imposed by the court.

*Fatemi v. Fatemi*, 339 Pa.Super. 590, 489 A.2d 798, 801–802 (1985).

In Nicholas' case, one of life's realities is that one of his parents is homosexual. In the absence of evidence that the homosexuality in some way harms the boy, limiting Nicholas' relationship with that parent fails to permit him to confront his life situation, however unconventional it may be:

Although courts have gone to great lengths to provide every child with precisely one mother and one father, the realities of family formation and parenting are considerably more complex. Lesbian-mother families are but one alternative to the presumed form. In resolving disputes about the custody of children, the court system should recognize the reality of children's lives, however unusual or complex. Courts should design rules to serve children's best interest. By failing to do so, they perpetuate the fiction of family homogeneity at the expense of the children whose reality does not fit this form.

Polikoff, This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian–Mother and Other Nontraditional Families, 78 Georgetown Law Journal 461 (1990), at 469. Nicholas' best interest is served by exposing him to reality and not fostering in him shame or abhorrence for his mother's nontraditional commitment.

Based on the trial court's statement that no adverse effect to Nicholas had been shown by the mother's lesbian relationship, and its crediting of the expert who strongly supported the quality of mother's parenting, the trial court's restriction on the mother's partial custody is unsupportable. The trial court therefore abused its discretion in restricting the mother's visitation.

In this case, the facts found by the court establish that the presence of mother, in the company of her partner Sandy E., is a positive factor in Nicholas' life. The mother and Sandy E. have lived together in a stable relationship for over six years. Psychologist Kristofits, whose opinions the trial court credited, testified that both mother and Sandy have good parenting skills. Trial Ct.Op., p. 4. When Nicholas visits, mother and Sandy E. join with him in such activities as going to the movies, attending church, playing miniature golf, taking classes at the local YMCA and entertaining friends. R.R. 196A, 229A, 230A.

Nicholas appears to be comfortable with and genuinely fond of Sandy E. He has known her as his mother's partner since before he was two years old. Nicholas told the trial court that

he "likes Sandy and enjoys being at her home sometimes." Trial Ct.Op., p. 4. When asked by psychologist Kristofits if he was angry that his mother was with a female, Nicholas said "No; I like Sandy." R.R. 130A. When Kristofits asked Nicholas if he would prefer his mother to be with a man, he said "No; it doesn't matter. I like Sandy and I wouldn't want to see her sad." R.R. 130A. The trial court itself concluded there was "no question that the mother and [her partner] both care for the boy, have good parenting skills and have his best interest at heart." *Ibid.*[2]

Mother raises a number of other issues on appeal, including the claim that the trial court's order impermissibly infringes on her constitutional rights to free speech and association. Because we have reversed the order of the trial court, we need not consider the additional grounds for reversal urged by mother. We have also reviewed mother's claim that the trial court erred in failing to grant her petition for primary physical custody of Nicholas. We find no error in the trial court's disposition.

**2.** We note that a variety of psychological studies indicate that lesbianism does not correlate negatively with the ability to raise a healthy, normal child. J. Kleber, R. Howell, A.L. Tibbits–Kleber, *The Impact of Parental Homosexuality in Child Custody Cases: A Review of the Literature*, Bull. Am. Acad. Psychiatry Law, Vol. 14, No. 1 (1986) (concluding that "[r]esearch regarding lesbian motherhood has consistently failed to provide any evidence for necessarily inferior parenting styles. Children of lesbian mothers have not demonstrated aberrant gender identity development, increased preference for homosexual object choice, nor enhanced social/emotional maladjustment, when compared with children raised by single heterosexual mothers ... The evident and clearly expressed priority of mental health professionals knowledgeable of the research findings in this area is to identify objectively all aspects of the divorce and custody situation and to evaluate these factors, inclusive of parental sexual orientation, in terms of factual certainty as opposed to presumptive subjective bias."); R. Green, J.B. Mandel, M. Hotvedt, J. Grey, L. Smith, *Lesbian Mothers and Their Children: A Comparison with Solo Parent Heterosexual Mothers and Their Children*, 15 Archives of Sexual Behavior 167 (1986) ("The postulated compromised parental fitness of lesbian mothers, commonly asserted in child custody cases, is not supported by these data."); M. Kirkpatrick, C. Smith, R. Roy, *Lesbian Mothers and Their Children: A Comparative Survey*, American Journal of Orthopsychiatry, July 1981 (prevalence of disturbance among children not found to be related to mother's sexual object choice).

540

On the basis of this record, there is no support for the trial court's order restricting mother's partial custody. We therefore vacate the order of the trial court and reinstate the November 13, 1990 custody order.