**Rivera v. Argot**

C.P. of Monroe County, no. 554 D.R. 1994.

*Jeffrey J. Kash,* for plaintiff.
*Wieslaw T. Niemoczynski,* for defendant.

WALLACH MILLER, *J.,* October 8, 1998—Amy Argot, Mother, met Pedro Rivera, Father, when she was 16 and working at K-Mart in Mount Pocono, Monroe County. He was 18, recently graduated from Pocono Mountain High School, and also working there. They began dating and married on June 1, 1991. Amy's parents were not in favor of this marriage. Five months after the wedding, their son Malcolm was born on November 6, 1991.

Mother finished high school at Pocono Mountain and the couple then moved to Philadelphia, where Father had extended family. Mother attended the Philadelphia College of Art briefly. Both parties worked minimum wage jobs until the summer of 1993, when Mother returned to the Poconos with Malcolm. Father soon followed. The parties lived together a short time and then separated. They agreed to a no-fault divorce, which was entered by this court on November 23, 1994.

On February 9, 1995, Father filed a complaint for custody and after a hearing before the master, the parties agreed to a shared schedule wherein Father would have physical custody of Malcolm every weekend and three weeks in the summer. Mother would have custody all other times.

On August 23, 1996, Father filed a petition for emergency relief when Mother announced she was moving to North Carolina with Malcolm. Following a meeting with the custody conciliator, the parents agreed to shared legal custody and a shared physical custody schedule which would give each of them alternating weeks of custody.

On October 8, 1997, Father filed a petition for modification and a conciliation conference was held on November 18, 1997. Both parties asked for primary physical custody at that time. Home studies were requested, and the conciliator recommended that the alternating weekly schedule continue.

Catholic Social Services completed the home studies on February 25, 1998, and on June 22, 1998, Mother petitioned for an evidentiary hearing which occurred on September 22, 1998.

While both parents have moved to new locations since the home studies were completed, the descriptions of the parents' residences in the home studies are of little consequence. However, the background information provided by the home studies gives us a great deal of insight into the parents, and confirms our observations of the parents and parties involved in this child's life. The home studies are in evidence as a joint exhibit. Based on the evidence presented, we find that both parties' current homes are more than adequate.

Perhaps the best way to describe this case is that of a clash of cultures. Mother's family lives in an area of Monroe County that is referred to as "the Mountain." The Argots are a large and respected clan in that area. They are hardworking, proud and proficient hunters, fishermen and outdoorsmen. They are also opinionated and wary of outsiders.

Father's family comes to Monroe County by way of his father's transfer with a company that moved its manufacturing plant to Mount Pocono. He was raised primarily in Philadelphia in a proud and hardworking Hispanic culture. He has held numerous jobs since high school and has been employed for the last three years by CorNet International as a software analyst.

Malcolm is a part of both cultures, something each of the parents can't seem to comprehend. Their constant denigration of each other has come to a point where this soon to be 7-year-old is like many children we see in custody cases—angry and confused. We met with Malcolm in chambers, and in many ways he's a normal little boy. He's bright, active and curious. He's also frightened and unsure of what his future holds. While he told us many contradictory things, the one thing he was certain of was his fear of losing both of his parents.

Child custody cases are the most difficult assignment a judge can receive. While the law is relatively simple on its face—"the best interest of the child"—the determination must be made on a case-by-case basis and requires weighing all factors which bear upon a child's physical, intellectual, moral and spiritual well-being. *Barron v. Barron,* 406 Pa. Super. 401, 594 A.2d 682 (1991); *Blew v. Verta,* 420 Pa. Super. 528, 617 A.2d 31 (1992).

The parents are currently sharing custody of Malcolm on an alternating weekly schedule based on an agreement they reached two years ago. Both live in the same school district, thus Malcolm can access both homes by school bus. All agree that he is doing well in school. He has friends in school and in both neighborhoods. He has become a Cub Scout.

At the evidentiary hearing, Father testified that he thought the current arrangement was working well but he wanted primary physical custody because he felt that Mother was unstable, was causing Malcolm to be torn apart by her constant criticism of him and his culture, and was concerned that he was being replaced by Mother's boyfriend.

On the other hand, Mother testified that she thought the current arrangement was not good for Malcolm because he wasn't being cared for properly, he sometimes wore dirty clothes, on one occasion he was wearing underwear that was too small, Father failed to cut Malcolm's fingernails, Malcolm was unruly when she picked him up and Father was unstable because he held numerous jobs.

One of the advantages of being a trial court judge is that we get to see the parties when they testify. Often what happens in the courtroom isn't evident on the record. While Father testified in a calm and credible manner, Mother's reaction was dramatic and disproportionate. She clearly was not listening to what he said but was only concerned with refuting it. With much whispering to her counsel and passing of notes, she made it clear without saying that we shouldn't believe a word he was saying. Once on the witness stand, she testified that she has no respect for Father. She blatantly admitted she doesn't like

him and admitted to calling him a variety of names, but that these "were not directed at Malcolm." She admitted she discusses the custody and court issues with Malcolm and attributes Malcolm's anger to Father's teaching him karate and kickboxing and allowing him to watch "Buffy, the Vampire Slayer." In spite of her testimony that she considers this television program inappropriate, her exhibit no. 32 shows Malcolm dressed for Halloween 1997 as a vampire in a costume she provided. Mother further testified that she wants primary custody because Malcolm "needs one family to love."

We also heard testimony from Shandra Rivera who has been married to Father since January of 1996. She is the mother of Malcolm's two half-brothers, Miguel, age 2 and Daivin, 8 weeks. We must agree with the characterization of her in the home study. She impressed us as a calm and competent person mature beyond her 21 years. She recognizes her position as Malcolm's stepmother and treats him equally with all of the children. On one occasion when Malcolm referred to her as "Mommy," he was corrected and it hasn't occurred again. She further impressed us as a stable and intelligent woman. She is currently on a maternity leave from CorNet International.

Mother called as a witness Anthony Antonacci whom she has been dating for six months and engaged for two. She currently lives in Mr. Antonacci's home. He testified that he has an excellent relationship with Malcolm and that Malcolm sometimes calls him "Dad." When this occurs, neither Mother nor Mr. Antonacci correct him. Prior to dating Mr. Antonacci, Mother had a relationship with another man who had moved in with her subsequent to her divorce. According to Mother's home study, this

relationship ended due to his physical and emotional abuse.

Perhaps the witness giving us the most insight into the case was Ray Argot Jr., Malcolm's maternal grandfather. He and his wife live about two miles from Mother. Malcolm spends a lot of time at their home, which is in a wooded area where they have horses, chickens and pigs. He plans to teach Malcolm to shoot and hunt and has a collection of knives that he plans to give Malcolm "when he's older, around 12." Mr. Argot testified in a frank and forthright manner and admitted to some swearing and cursing in Malcolm's presence but testified he didn't use certain swear words "because they were Negro words." While he denied using the pejorative "spic," he readily admitted to "Here comes Julio in the Puerto Rican mobile" when Father comes to pick up Malcolm. Malcolm is his only grandchild.

Other witnesses included Heather Ace, Mother's best friend, who corroborated that Father was a liar and not to be trusted. We find her lacking in credibility. Ellen Bilger, a relative of Mother's who cares for Malcolm while Mother works, testified in a credible and rational manner. Jeanne Shoemaker, Father's supervisor at his place of employment, testified that he was a dedicated worker, on time, and reliable. We find her to be a credible witness.

All witnesses testified that they loved Malcolm and wanted what was best for him. Thus, we are confronted with the question of what order will serve Malcolm's best interests? As Judge Spaeth wrote in *In re Custody of Temos,* 304 Pa. Super. 82, 450 A.2d 111 (1982), "child custody cases are among the most difficult of cases, and we pretend to no special wisdom regarding their proper

disposition. . . . Every current of our lives flows through them. They engage our most deeply held beliefs, recall our most poignant experiences. No concern is more precious than our children, not simply because we care so much about their present happiness but because the future depends upon their wholesome growth." *Id.* at 94, 95, 450 A.2d at 117.

In this case, it is clear that Malcolm is subjected to unpleasant comments about his Hispanic heritage while with his Mother and her family. We do not believe that they realize how this can impact on this little 6-year-old. However, "[a] court may not assume that because children will encounter prejudice in one parent's custody, their best interests will be served by giving them to the other parent." *In re Temos, supra* at 100, 450 A.2d at 120. If children are taunted and hurt, with love and help they may surmount their hurt and grow up strong and decent—the sort of children of which any parent would be proud. *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976); *Commonwealth ex rel. Lucas v. Kreischer,* 450 Pa. 352, 299 A.2d 243 (1973). See also, *In re Davis,* 288 Pa. Super. 453, 432 A.2d 600 (1981). We know that may not happen, and can only hope that the adults will understand the damage to Malcolm that their behavior causes.

The *Temos* case involved a mother who was involved in an interracial relationship. Our Superior Court reversed the trial court's grant of custody to father, finding that the lower court failed to examine all of the factors involved in the case and focused only on the children's problems with mother's African-American paramour.

We believe that the best interests of Malcolm are best served by leaving in place the current order. It provides

for shared legal and physical custody and we find that the evidence shows that the criteria for this type of an order are met. See *In re Wesley J. K.,* 299 Pa. Super. 504, 455 A.2d 1243 (1982). We find both parents are fit and both desire a continuing involvement with Malcolm. Both parents are seen by Malcolm as sources of security and love; the parents are able to communicate on a minimal level. We recognize that no couple, divorced or intact, agrees on every aspect in the upbringing of a child. As Malcolm becomes older, the time spent in each household may need to be extended. However, at his age, research shows that children believe a parent has stopped loving them when contact is reduced. According to studies conducted by the Center for Divorce Education and endorsed by the National Council of Juvenile and Family Court Judges, children in the 6- to 8-year-old group hope and believe that someday mom and dad will get back together, and will feel a sense of responsibility to take care of the parents, despite their own emotional needs. Parents are advised that children of this age group especially need to be protected from the parents' disappointments and anger. They need to avoid, at all costs, criticizing the other parent in front of the children. What children need most at this time is the reassurance from *both* parents that although mom and dad don't get along well enough to live together, they both still love and will take care of the children. And it is critical that the children be assured that it is all right to still love both parents. Arbuthnot, J. and Gordon D. (1992), *What about the Children: A Guide for Divorced and Divorcing Parents,* Athens, Ohio: The Center for Divorce Education.

The issues raised by both parents are issues that we see in all custody cases. Parents need to understand that

regardless of what custody schedule is in place, even if it be weekends, there will be an adjustment period when Malcolm comes into their home. It's very common for children in custody cases to be unruly for a time and run through the house upon arrival. The child is making sure that nothing has changed while he's been gone. Is his bed still where it was when he left? Does the dog still know him? Are his fish still alive? Is his favorite drink still in the refrigerator? It's part of his need to know that he's still loved and a part of this family. We also find that 6-year-old boys get dirty. That's normal. Malcolm's anger will only lessen when his parents' anger and animosity lessen.

Both families involved in this case have a culture, history and capacity for love that can be of immense value and importance to Malcolm as he grows. The question remains as stated above: will they have enough respect and love for Malcolm to put their adult biases aside and recognize that he is their creation and a part of both of them?

## ORDER

And now, October 8, 1998, the order of this court dated September 13, 1996 based upon an agreement of the parties shall become the final order in this case.