721 A.2d 662

Kimberly BOSWELL

v.

Robert G. BOSWELL.

No. 4, Sept. Term, 1998.

Court of Appeals of Maryland.

Dec. 18, 1998.

Cynthia E. Young, Annapolis, for petitioner.

Nancy Polikoff, American University Law School, Washington, DC; Beatrice Dohrn, Lambada Legal Defense and Education Fund, Inc., New York City, all on brief, for respondent.

James L. McHugh, General Counsel, Nathalie F.P. Gilfoyle, American Psychological Ass'n, Carolyn Polowy, General Counsel, Nat. Ass'n of Social Workers, Paul M. Smith, Nory Miller, Elena N. Broder, Jenner & Block, all of Washington, DC, amici curiae for American Psychological Ass'n and Nat. Ass'n of Social Workers.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CHASANOW, Judge.

In the instant case, Kimberly Boswell (Petitioner) asks us to clarify the standard a court should apply in determining the extent of restrictions on parental visitation of children in the presence of non-marital partners. Petitioner claims that the "best interests of the child" standard should apply and that the Court of Special Appeals erred in applying an "actual harm" standard. Robert Boswell (Respondent) contends that the Court of Special Appeals did apply the best interests of the child standard, correctly coupling this standard with the need for a factual finding of actual harm in order for parental visitation to be restricted. For the reasons set forth below, we affirm the judgment of the Court of Special Appeals and hold that the correct standard to be applied is the best interests of the child, with visitation being restricted only upon a showing of actual or potential harm to the child resulting from contact with the non-marital partner.

I.

This appeal arises from an order of the Circuit Court for Anne Arundel County, restricting Respondent's visitation with his children. Respondent appealed to the Court of Special Appeals, which vacated the judgment of the circuit court, including all of the visitation restrictions. *See Boswell v. Boswell,* 118 Md.App. 1, 701 A.2d 1153 (1997). Petitioner filed a motion for reconsideration and for a stay, which the Court of Special Appeals denied. Petitioner then petitioned for certiorari to this Court, challenging only that portion of the Court of Special Appeals' order vacating the prohibition on visitation in the presence of Respondent's non-marital partner. We granted certiorari and affirm the judgment of the Court of Special Appeals.

II.

This Court concurs with the procedural history and facts of this case as presented in the opinion of the Court of Special Appeals. *Boswell,* 118 Md.App. at 5–8, 11–22, 701 A.2d at 1154–56, 1158–63. For the purposes of this appeal, we will summarize only the pertinent facts and circumstances.

Robert Boswell and Kimberly Boswell were married in May 1986. Two children were born of the union, son Ryan born in 1988 and daughter Amanda born in 1991. In August 1994, the parties separated after Mr. Boswell told his wife that he was homosexual. In February 1995, Mr. Boswell began living with Robert Donathan, with whom he began an intimate relationship after he and Ms. Boswell separated.

Ms. Boswell filed the initial complaint for limited divorce on October 5, 1994. On January 20, 1995, Judge James Cawood of the Circuit Court for Anne Arundel County ordered visitation between Mr. Boswell and his children each Wednesday evening and every other weekend. On February 2, 1995, the Boswells were ordered to meet with the Department of Social Services, which was to report to the court regarding custody and visitation. Mr. Boswell filed a counterclaim for absolute divorce in July 1995 and Ms. Boswell filed an amended complaint in August 1995.

Even though the parties filed a pretrial order on December 12, 1995, stating that the only contested issues were alimony and counsel fees and projecting a one-day trial, no final agreement was entered before trial. Thus, the trial over which circuit court Judge Lawrence Rushworth presided lasted five full days (March 12, 13, 14, and April 1, 4, 1996). Most of the testimony concerned disputes over the value, possession, and disposition of various personal property items. Both parties agreed that primary custody was to remain with Ms. Boswell. As to visitation, on April 1, 1996, Mr. Boswell moved for recusal of Judge Rushworth based on statements he made during the conference that indicated a predisposition to limit the father's visitation, specifically permitting no contact between Amanda and Ryan and Mr. Donathan. Mr. Boswell claimed these statements demonstrated undue prejudice toward his case. The court denied the motion.

On April 5, 1996, the parties reached agreement on the financial issues and the judge ruled from the bench on visitation. In its oral opinion, the court awarded sole custody to Ms. Boswell and severely curtailed Mr. Boswell's visitation.

In its written order filed on April 26, 1996, the court limited Mr. Boswell to visiting with his children every other Saturday from 8:00 a.m. to 8:00 p.m., every other Sunday from 11:00 a.m. to 8:00 p.m. and every Wednesday from 3:00 p.m. to 8:00 p.m. on school days and from 8:00 a.m. to 8:00 p.m. on non-school days. The order further prohibited any overnight visitation and visitation with the children in the presence of Mr. Donathan or "anyone having homosexual tendencies or such persuasions, male or female, or with anyone that the father may be living with in a non-marital relationship."

The trial court placed these limitations on Mr. Boswell's visitation even though they were not requested by Ms. Boswell. Indeed, when Ms. Boswell testified and was asked her opinion about the children's visitation with their father, she replied "I think that they should visit him. * * * [E]very other weekend and in the mid-week is fine." She also agreed with the recommendation of Marcia Kabriel, the court-appointed social worker, that Mr. Boswell should have visitation with the children one week per month during the summers. Furthermore, Ms. Boswell never testified that she wanted Mr. Boswell to exclude Mr. Donathan from visitation, nor did she allege that Mr. Donathan's presence during visitation was harmful to the children. Visitation only became a disputed issue when Ms. Kabriel recommended an increase in Mr. Boswell's visitation, which he then asked the court to grant, and Ms. Boswell disagreed with some of the social worker's suggestions. Specifically, Ms. Boswell did not want any overnight visits during the week nor did she want summer visits scheduled for consecutive weeks and no visitation in August due to her own vacation plans.

The trial judge primarily based his visitation order on videotaped *in camera* interviews with Ryan and Amanda, which yielded no definitive response from either child as to how they felt about visitation in the presence of Mr. Donathan.[1] The court made the following comments from the bench concerning Mr. Boswell's visitation with his children:

---

1. The children's answers to the judge's questions as to whether they preferred visitation without Mr. Donathan present were as follows:

"[W]here there is a ... paramour involved.... I have often, time and time again, restricted visitation. I think that's only appropriate. * * * [I will hold] down the ... visitations of both the weekend and Wednesday and [restrict] during this period any overnight visitation. Clearly the Court is convinced that ... there is a relationship, at least up until this time, and no concern to change before this time, that [Mr. Boswell] is sleeping with ... another person *without the cloak of a marital relationship.*

\* \* \*

[T]here will be no visitation in the home where there is ... Donathan. *Or any other situation that goes to a relationship that isn't condoned.*

\* \* \*

Mr. Boswell, there may come a time when you would elect to have someone else stay at the home with you, perhaps a female companion or another male companion, but my order is that the children are not to visit you under those circumstances. So if it means taking them to some other place, some neutral place, then that's the Order of this Court, and that's a strict order [until] *it is clear to me that we'll have no situation where you have a live-in companion.*" (Emphasis added).

On August 22, 1996, upon a second request by Mr. Boswell's counsel, Judge Rushworth recused himself from any additional proceedings in this case. Mr. Boswell appealed to the Court of Special Appeals, with his principal argument being that the

---

"[Amanda:] I just want to visit my dad. Not Mr. Rob [Donathan]. Only sometimes I want to visit Mr. Rob.
[The Court:] Sometimes you want to visit him? So you get along with Mr. Rob?
[Amanda:] Uh-huh.
[Ryan:] She does. I don't.
[The Court:] Okay. But, Ryan, you're certain about that? You would rather not visit with your dad when Mr. Rob is there? Is that....
[Ryan:] Yeah, but I don't want him to move away, because he has a dog and I really like the dog."

trial court failed to make any findings of fact upon which to base its visitation order. The Court of Special Appeals entered a judgment in Mr. Boswell's favor on October 29, 1997, vacating the prohibition against overnight visitation. The court determined that the trial judge had erroneously concluded that Dr. Kay Standley objected to all overnight visitation and that neither Ryan nor Amanda wanted to visit overnight, when in actuality it was only Ryan who felt this way. The court remanded this issue to the trial court to determine if it would impose the same restriction. Regarding the prohibition against visitation in the presence of Mr. Donathan, the court vacated it without remand for two reasons:

> "The court articulated no reasons for the restriction other than the 'inappropriateness' of the relationship, and it failed to state on the record how the children might be harmed by exposure to the relationship. Given the testimony of Kabriel, Standley, Officer Parsons, and Officer Bauman, we hold that there was no evidentiary basis for the court to conclude the relationship was harmful to the children. Hence, the court could not have articulated any harmful effect, since there was no evidence to support such a finding. There was therefore no showing that the restriction was necessary to prevent any adverse impact on the children."

*Boswell,* 118 Md.App. at 33–34, 701 A.2d at 1169. The court also vacated the remainder of the visitation prohibitions without remand.

Ms. Boswell filed a motion for reconsideration and for a stay, alleging that the Court of Special Appeals had incorrectly applied an "actual harm" standard rather than the best interests of the child standard to the visitation issues. The motion and stay were denied on December 5, 1997, with the court maintaining it had applied the correct standard, that being the best interests of the child with a required factual showing of actual harm in order for visitation to be restricted. In its opinion denying the motion for reconsideration, the court stated: "The distinction appellee attempts to draw between the 'actual harm' standard and the 'best interest of the

child' standard is illusory." Ms. Boswell then petitioned for, and was granted, certiorari to this Court solely on the issue regarding the prohibition on visitation in the presence of Mr. Boswell's partner, Mr. Donathan. Specifically, we are asked to clarify the standard a court must apply in determining the extent of restrictions on parental visitation of children in the presence of non-marital partners. Ms. Boswell claims the "best interests of the child" standard should apply and that the Court of Special Appeals erred in applying an "actual harm" standard. Mr. Boswell contends that the Court of Special Appeals did apply the best interests of the child standard, correctly coupling this standard with the need for an evidentiary showing of actual harm in order for parental visitation to be restricted. In affirming the Court of Special Appeals' judgment, we want to clarify that the Court of Special Appeals' judgment should not be interpreted as articulating an "actual harm" standard that is separate and distinct from the best interests of the child standard. We seek to clarify that only one standard is used in determining whether to restrict parental visitation in the presence of non-marital partners, bests interests of the child, but we also want to emphasize that when a court is engaging in a best interests analysis, reasonable maximum exposure to each parent is presumed to be in the best interests of the child.

Before we begin our analysis, it is useful to briefly summarize the role the following individuals have played in the proceedings to date.

## A. Robert Donathan

Robert Donathan has been Mr. Boswell's live-in partner since February 1995. He has been present during Ryan and Amanda's visitation with their father, with the exception of the period when Judge Rushworth's order was in effect from April 1996 until December 1997. During the trial, Mr. Boswell testified that he and Mr. Donathan slept in the same bedroom when the children came to visit, but when he learned that this upset Ryan, the two began sleeping in separate bedrooms during visitation. Mr. Boswell and Mr. Donathan agreed that

Mr. Donathan would not actively discipline the children and this arrangement was generally followed. Basically, Mr. Donathan's role with Ryan and Amanda during visitation was to play with them and participate in outings and activities that they had planned with their father.

## B. Marcia Kabriel

Marcia Kabriel was the court-appointed social worker who investigated the Boswell's situation and made a recommendation concerning custody and visitation in an October 30, 1995, report. At trial, she testified that after conducting over 20 interviews with the parties, her conclusion was that Ryan and Amanda had bonded well with both parents. Ms. Kabriel recommended that the children's primary residence remain with Ms. Boswell, and that Mr. Boswell be granted liberal visitation to include a week with the children each of the summer months along with every other weekend and Wednesday evenings. Although Ms. Kabriel did not initially suggest overnight visitation on Wednesdays, she later recommended this due to the difficulties the children were experiencing in dealing with their parent's separation and the acrimony between them.

Ms. Kabriel indicated that while both children were "confused" by their father's relationship with Mr. Donathan, Amanda was adjusting fairly well but Ryan was having difficulty accepting it. When pressed by Ms. Boswell's attorney to clarify whether the children were confused due to the homosexual aspect of their father's relationship with Mr. Donathan, Ms. Kabriel stated:

"[A]ny kind of a relationship, *heterosexual or homosexual,* is going to be confusing and impact on the children.

\* \* \*

The children would have been confused *if it had been a man or a woman.* The children routinely in the first year or two after a separation and divorce have hopes that their parents will reconcile. They want them together and so the whole situation would be confusing to them." (Emphasis added).

· When asked whether it would be better for Ryan and Amanda if Mr. Donathan were absent whenever they visited their father, Ms. Kabriel replied:

"I think that if the parents could begin to work together and communicate and plan for these children and reduce the tension between—that exists between the parents, this makes more sense in terms of [Donathan] has been in these children's lives now for over a year and I don't think that he's just going to go away. So in a sense the children have already had their experience with him and have a relationship with him."

## C. Dr. Kay Standley

Dr. Kay Standley is a child psychologist with whom the Boswell children were in therapy. She began seeing Ryan in January 1995 and Amanda in April 1995, both on a weekly basis, and she was still seeing them at the time of trial. In testifying as an expert witness for Ms. Boswell, Dr. Standley stated that Amanda's concerns were related to the animosity between her parents, but that Ryan's adjustment to the separation was more problematic due to his Attention Deficit Disorder, poor self-image and difficulty with peer relationships.

When questioned about how the temporary visitation schedule was working, Dr. Standley testified that "the weekend visits seem to have become, in the last few weeks, more pleasant and the children don't . . . seem to be as distressed." In testifying about the "during the week" visitation, Dr. Standley stated that while spending the night on Wednesdays was too disruptive "certainly Mr. Boswell would spend some time on a Tuesday or a Wednesday night because . . . for the children, that's a very long period of time. They shouldn't go a long time without contact with both parents." Indeed, Dr. Standley expressed her opinion that in situations such as Ryan and Amanda's, she was "very much in favor of both parents having a great deal of contact with the [children]."

In response to a question about the effect Mr. Boswell's homosexual relationship with Mr. Donathan was having on the children, Dr. Standley testified that Ryan was distressed and concerned. However, when asked whether it would be better for Ryan and Amanda if Mr. Donathan were not present during visitation, she focused her answer on the effect that any relationship of Mr. Boswell's, heterosexual or homosexual, would have on the children:

> "In any situation like this as the children adjust to a parental separation, divorce and the realignment of parents with new partners, it's very, very important *whether that is the same sex or an opposite sex partner* that there be a very slow period of exposure to the—to the children of that—that new partner. That should proceed deliberately and very slowly.
>
> \* \* \*
>
> [C]hildren in a situation like this really need to be reassured that they have the affection and the continuing relationship of each parent . . . and that—that no other person, no other relationship will—will interfere with that." (Emphasis added).

Regarding the children's adjustment to their father's relationship with Mr. Donathan, Dr. Standley stated that while their father's new relationship was initially difficult for them, especially considering how quickly they were exposed to it, she acknowledged "they seem to be adjusting a little bit better now."

## III.

### A. The Best Interests of the Child

 A parent has a fundamental right to the care and custody of his or her child. The United States Supreme Court has upheld the rights of parents regarding the care, custody, and management of their children in several contexts, including child rearing, education, and religion. *See Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)(over-

turning a mandatory schooling law in the face of Amish claims of parental authority and religious liberty); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)(discussing the right of parents to raise their children); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944)(observing that "the custody, care, and nurture of the child reside first in the parents"); *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942)(stating the right to rear a child is encompassed within a parent's "basic civil rights"); *Pierce v. Society of Sisters of Holy Names,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)(sustaining parents' authority to provide religious schooling against State requirements of public school attendance); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)(upholding parental authority to have children taught in languages other than English). The Supreme Court's long history of affording protection to parents in the realm of child rearing and family life was acknowledged in *Wolinski v. Browneller,* 115 Md.App. 285, 299, 693 A.2d 30, 36–37 (1997):

> "A parent's Fourteenth Amendment liberty interest in raising his or her children as she sees fit, without undue interference by the State, has long been a facet of that private realm of family affairs over which the Supreme Court has draped a cloak of constitutional protection."

In accordance with the Supreme Court, Maryland has declared that a parent's interest in raising a child is a fundamental right that cannot be taken away unless clearly justified. *In re Adoption No. 10941,* 335 Md. 99, 642 A.2d 201 (1994). The Court of Special Appeals, in *In re Adoption,* 103 Md.App. 1, 12, 651 A.2d 891, 897 (1994) stated: "This right is in the nature of a liberty interest that has long been recognized and protected under the state and federal constitutions."

In the context of most family law disputes over children, the State's interest is to protect the child's best interests as *parens patriae,* which is in accord with the State's interest in protecting the health, safety, and welfare of its citizens. *"Parens patriae"* refers to the "principle that the state must care

for those who cannot take care of themselves, such as minors."
BLACK'S LAW DICTIONARY, at 1114 (6 th ed.1990).

■ In Maryland, the State's interest in disputes over
visitation, custody, and adoption is to protect the "best inter-
ests of the child" who is the subject matter of the controversy.
*Wolinski,* 115 Md.App. at 301, 693 A.2d at 37. We have
described the best interests of the child standard as being " 'of
transcendent importance' " and the " 'sole question' " in famil-
ial disputes; indeed, it is "therefore not considered as one of
many factors, but as the objective to which virtually all other
factors speak." *Taylor v. Taylor,* 306 Md. 290, 303, 508 A.2d
964, 970 (1986)(quoting in part from *Ross v. Hoffman,* 280 Md.
172, 175 n. 1, 372 A.2d 582, 585 n. 1 (1977)).

The best interests of the child standard has long been
applied by Maryland courts to resolve family law disputes. In
*Pangle v. Pangle,* 134 Md. 166, 170, 106 A. 337, 338 (1919), a
child custody case dating back almost 80 years, this Court
stated: "The primary concern in cases of this nature is to
make such an award of the custody of the child as will
promote its highest welfare." Similarly, 10 years later this
Court reaffirmed its use of the best interests of the child
standard in custody cases when it declared: "[T]he paramount
consideration [is] what will be for the best interest of the
children and most conducive to their welfare." *Carter v.
Carter,* 156 Md. 500, 505, 144 A. 490, 492 (1929). While these
early cases apply the best interests standard in the context of
child custody determinations, later cases have held that visita-
tion is governed by the same principles because visitation "is
considered to be a form of temporary custody." *Beckman v.
Boggs,* 337 Md. 688, 703 n. 7, 655 A.2d 901, 908 n. 7 (1995).
*See also Skeens v. Paterno,* 60 Md.App. 48, 61, 480 A.2d 820,
826 (1984)(observing that the ultimate test for custody and
visitation is the best interests of the child).

Thus, while a parent has a fundamental right to raise his or
her own child, this Court has held that the best interests of
the child may take precedence over the parent's liberty inter-
est in the course of a custody, visitation, or adoption dispute.

"We have made clear ... that the controlling factor in adoption and custody cases is not the natural parent's interest in raising the child, but rather what best serves the interest of the child." *In re Adoption No. 10941*, 335 Md. at 113, 642 A.2d at 208. The best interests standard does not ignore the interests of the parents and their importance to the child. We recognize that in almost all cases, it is in the best interests of the child to have reasonable maximum opportunity to develop a close and loving relationship with each parent.

As to visitation, the non-custodial parent has a right to liberal visitation with his or her child "at reasonable times and under reasonable conditions," but this right is not absolute. *Myers v. Butler*, 10 Md.App. 315, 317, 270 A.2d 341, 342 (1970). As stated in the well-known treatise, 2 WILLIAM T. NELSON, DIVORCE AND ANNULMENT § 15.26, at 274–75 (2d ed.1961), which has been cited in numerous Maryland cases:

> "[A] parent whose child is placed in the custody of another person has a right of access to the child at *reasonable times.* The right of visitation is an important, natural and legal right, although it is not an absolute right, but is one which must yield to the good of the child." (Emphasis added and footnotes omitted).

*See also North v. North*, 102 Md.App. 1, 12, 648 A.2d 1025, 1031 (1994); *In re Jessica M.*, 312 Md. 93, 113–14, 538 A.2d 305, 315 (1988); *Shapiro v. Shapiro*, 54 Md.App. 477, 482, 458 A.2d 1257, 1260 (1983); *Radford v. Matczuk*, 223 Md. 483, 488, 164 A.2d 904, 907 (1960). Not only must access to the children be reasonable, but any limitations placed on visitation must also be reasonable. *North*, 102 Md.App. at 12, 648 A.2d at 1031. In examining the reasonableness of a visitation restriction, courts will look to see if the child is endangered by spending time with the parent: "Visitation rights, however, are not to be denied even to an errant parent unless the best interests of the child would be endangered by such contact." *Roberts v. Roberts*, 35 Md.App. 497, 507, 371 A.2d 689, 694 (1977).

■ Because visitation generally is awarded to non-custodial parents not for their gratification or enjoyment, but to fulfill the needs of the child, when the child's health or welfare is at stake visitation may be restricted or even denied. *See Fairbanks v. McCarter*, 330 Md. 39, 49, 622 A.2d 121, 126 (1993). In situations where there is evidence that visitation may be harmful to the child, the presumption that liberal unrestricted visitation with a non-custodial parent is in the best interests of the child may be overcome. Applying a best interests standard, coupled with a finding of adverse impact, Maryland courts have restricted or denied visitation in situations involving sexual abuse, physical abuse, and/or emotional abuse by a parent. In *Painter v. Painter*, 113 Md.App. 504, 688 A.2d 479 (1997), the Court of Special Appeals upheld a trial court order that completely denied the father visitation with his 16–year-old son and limited visitation with his 11–year–old daughter on the basis of severe emotional and physical abuse. The court stated: "Given the extreme and unusual factual circumstances as to violence, and given Daniel's closeness to the age of majority, the denial of visitation was not an abuse of discretion." *Painter*, 113 Md.App. at 521, 688 A.2d at 487. *See also John O. v. Jane O.*, 90 Md.App. 406, 431–35, 601 A.2d 149, 161–63 (1992)(upholding restrictive visitation order denying father overnight visitation due to sexual misconduct with his minor child); *Hanke v. Hanke*, 94 Md.App. 65, 615 A.2d 1205 (1992)(upholding order denying overnight visitation of father with his four-year-old child because of past sexual abuse of his then-eleven-year-old stepchild and alleged sexual abuse of the four-year-old).

Some jurisdictions statutorily delineate the best interest factors that are to be applied to resolve family law disputes;[2]

---

**2.** States that statutorily delineate "best interests of the child" factors for use in visitation and/or custody proceedings include the following: ALASKA STAT. § 25.24.150(c)(1996); ARIZ REV.STAT. ANN. § 25–403A. (Supp. 1997); CAL. FAMILY CODE § 3011 (West Supp.1998); COLO.REV.STAT. ANN. § 14–10–124(1.5)(West Supp.1998)(effective February 1, 1999); DEL. CODE ANN. tit. 13, § 722 (1993 & Supp.1996); D.C.CODE ANN § 16–914(a)(3)(1997); IDAHO CODE § 32–717 (1996); ILL.ANN.STAT. ch. 750,

however, Maryland's factors derive from case law. In *Hild v. Hild,* 221 Md. 349, 357, 157 A.2d 442, 446 (1960), this Court provided a list of factors that courts may consider when applying the best interests standard to a custody case:

> "[T]he fitness of the persons seeking custody, the adaptability of the prospective custodian to the task, the age, sex and health of the child, the physical, spiritual and moral well-being of the child, the environment and surroundings in which the child will be reared, the influences likely to be exerted on the child, and, if he or she is old enough to make a rational choice, the preference of the child. It stands to reason that the fitness of a person to have custody is of vital importance. The paramount consideration, however, is the general overall well-being of the child." (Citation omitted).

■ These best interest factors also apply to visitation, as well as any other proceeding where the best interest of the child is at issue. Regarding the child's preference factor, we have stated that it is simply one factor to be considered, within the context of all other relevant factors. *Ross v. Pick,* 199 Md. 341, 353, 86 A.2d 463, 469 (1952). In *Ross,* we stated: "[T]he child's own wishes may be consulted and given weight if he is of sufficient age and capacity to form a rational judgment. * * * It is not the whim of the child that the court respects, but its feelings, attachments, reasonable preference and probable contentment." *Id. See also Leary v. Leary,* 97 Md.App. 26, 48, 627 A.2d 30, 40 (1993). As such, visitation cannot be denied to the non-custodial parent simply because the child says he or she does not want to spend time with his or her mother or father. In *In re Barry E.,* 107 Md.App. 206, 220, 667 A.2d 931, 938 (1995), the trial judge took the position

para. 602(a)(Smith-Hurd Supp.1998); Ind.Code Ann. § 31–14–13–2 (Burns 1997); Ky.Rev.Stat. Ann. § 403.270(1)(Michie/Bobbs–Merrill Supp.1996); La. Civ.Code Ann. art. 134 (West Supp.1998); Minn.Stat. Ann. § 257.025(a)(West 1998); Mo. Ann. Stat. § 452.375(2)(Vernon 1997); N.M. Stat. Ann. § 40–4–9 A. (Michie 1994); N.D. Cent.Code § 14–09–06.2 1. (1997); Tenn.Code Ann. § 36–6–106 (Supp.1998); Vt. Stat. Ann. tit. 33, § 5540 (1991); Va.Code Ann. § 20–124.3 (Michie 1995); Wis. Stat. Ann. § 767.24(5)(West 1993 & Supp.1997).

that a child should never be forced to visit with a parent if he or she does not want to, no matter what the age of the child. The Court of Special Appeals stated: "It cannot be left up to the unfettered discretion of ... five-year-old children whether to visit with their mother," particularly when there is no evidence in the record that the children possessed sufficient age and reason to make such a decision. *In re Barry E.*, 107 Md.App. at 220–21, 667 A.2d at 938.

█ In addition to the best interest factors enunciated in *Hild*, courts may consider such other things as:

"The desire of the natural parents and any agreements between them ... [t]he potential for maintaining natural family relations ... [m]aterial opportunities affecting the future life of the child ... [t]he residences of the parents and the opportunity for visitation ... [t]he length of the separation of the parents ... [w]hether there was a prior voluntary abandonment or surrender of custody of the child." (Footnotes omitted).

JOHN F. FADER, II & RICHARD J. GILBERT, MARYLAND FAMILY LAW 111 (1990).

█ Custody and visitation determinations are within the sound discretion of the trial court, as it can best evaluate the facts of the case and assess the credibility of witnesses. *Beckman*, 337 Md. at 703, 655 A.2d at 908. In applying the best interests of the child standard to a custody award or grant of visitation, a court is to consider the factors stated *supra* and then make findings of fact in the record stating the particular reasons for its decision. Maryland Rule 2–522(a) states: "In a contested court trial, the judge, before or at the time judgment is entered, shall dictate into the record or prepare and file in the action a brief statement of the reasons for the decision and the basis of determining any damages." At minimum, this rule mandates that the court state an objective to be served by the restriction and then detail the facts furthering the objective. *Boswell*, 118 Md.App. at 31, 701 A.2d at 1167–68. Rule 2–522(a) has been held by this Court to also apply to "a final judgment in every non-jury

action, whether legal or equitable in nature." *Kirchner v. Caughey*, 326 Md. 567, 573, 606 A.2d 257, 260 (1992). In *Lemley v. Lemley*, 102 Md.App. 266, 649 A.2d 1119 (1994), which involved a divorce proceeding, the Court of Special Appeals remanded certain portions of the case because the trial judge neglected to address the main findings separately and state for the record how each issue was specifically resolved.

Moreover, in making its written findings, the court is not allowed to consider one factor, such as a parent's adultery or homosexuality, to the exclusion of all others. For example, in *Davis v. Davis*, 280 Md. 119, 127, 372 A.2d 231, 235 (1977), we abolished the presumption that an adulterous parent is unfit to have custody of a minor child, stating that adultery is merely one factor that "should be weighed, along with all other pertinent factors, only insofar as it affects the child's welfare." *See also Robinson v. Robinson*, 328 Md. 507, 615 A.2d 1190 (1992); *Queen v. Queen*, 308 Md. 574, 521 A.2d 320 (1987); *Swain v. Swain*, 43 Md.App. 622, 406 A.2d 680, *cert. denied*, 286 Md. 754 (1979); *Draper v. Draper*, 39 Md.App. 73, 382 A.2d 1095 (1978)(following *Davis* holding).

Thus, if the trial court does not make the appropriate factual findings based on evidence presented, or relies on one factor to the exclusion of all others, then its visitation or custody order may be challenged. In such cases, the appellate court conducts three separate tiers of review. First, when the appellate court examines factual findings, the clearly erroneous standard of Maryland Rule 8–131(c) is applied:

> "*Action tried without a jury.* When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."

Second, if errors were made as to matters of law, additional proceedings in the trial court will usually be required unless the error is found to be harmless. Finally,

when the reviewing court concludes that the factual findings of the trial court are not clearly erroneous and that sound principles of law were applied, the trial court's decision will not be disturbed unless there has been a clear abuse of discretion. *Davis*, 280 Md. at 125–26, 372 A.2d at 234. In almost every case, the chancellor's decision regarding custody and visitation is given great deference "unless it is arbitrary or clearly wrong." *Hanke*, 94 Md.App. at 71, 615 A.2d at 1209.

## B. Actual Harm [3]

It is clear that the best interests of the child standard has long been used in Maryland to decide initial custody and visitation matters, coupled with the presumption that the child's best interests are served by reasonable maximum exposure to both parents. The best interests of the child standard is also used to limit or restrict custody and visitation. In cases where a change in custody or visitation is requested on the basis of actual or potential harm to the child, courts apply a best interests of the child standard concurrently with adverse impact, granting the modification or restriction only upon a showing of actual emotional or physical harm to the child. The requirement of proof of an adverse impact from a parent's non-marital relationship is an entrenched aspect of Maryland's custody jurisprudence, as demonstrated by the following cases.

*Swain* involved a father appealing the child custody portion of a divorce decree that awarded permanent custody to the mother, who was involved in an adulterous relationship. The court found that, since the child was not presently adversely

---

**3.** "Actual harm" is not an exclusive term and other terms may be used interchangeably throughout this opinion. Maryland cases have referred to the required evidentiary showing as "harmful effect" and "adverse impact" (*Boswell v. Boswell*, 118 Md.App. 1, 701 A.2d 1153 (1997)); "adverse effect" and "damaging impact" (*Robinson v. Robinson*, 328 Md. 507, 615 A.2d 1190 (1992)); "harmful effect"(*Queen v. Queen*, 308 Md. 574, 521 A.2d 320 (1987)); and "actual harmful effect" (*Swain v. Swain*, 43 Md.App. 622, 406 A.2d 680, *cert. denied*, 286 Md. 754 (1979)).

affected by her mother's adulterous relationship, the chancellor did not abuse his discretion in awarding custody to the mother. In following the *Davis* holding discussed in Part III. A., *supra*, the court stated:

> "[T]here are now no presumptions whatsoever with respect to the fitness of a parent who has committed, or is committing, adultery. Rather, adultery is relevant *only* insofar as it *actually* affects a child's welfare. We will not presume a harmful effect, and the *mere* fact of adultery cannot 'tip the balance' against a parent in the fitness determination. Thus, a chancellor should weigh, not the adultery itself, but *only any actual harmful effect that is supported by the evidence.*" (Emphasis in original and added).

*Swain*, 43 Md.App. at 629, 406 A.2d at 683–84.

In the similar case of *Queen*, the trial court expressed disapproval of a non-marital sexual relationship, basing its custody decision on personal bias rather than upon any harmful effect on the child. In awarding custody to the mother, the trial court made the following comments about the father: "[I]f you want custody of minor children and rear them you must be married. I'm not going to permit you not to be married to somebody and having custody of children." *Queen*, 308 Md. at 589, 521 A.2d at 328. This Court vacated the custody award, criticizing the trial court for relying on the existence of a non-marital relationship "without assessing whether that relationship would have *such a harmful effect on the child* as to outweigh other factors in favor of granting custody to the father." *Queen*, 308 Md. at 590, 521 A.2d at 328.

In *Robinson*, we once again examined the role of a non-marital sexual relationship in a custody proceeding where the father was seeking to revoke the mother's custody on the grounds of her adulterous relationship. In that case, the mother's boyfriend frequently stayed overnight with her, sleeping in the same bedroom. The mother's children were also exposed to their aunt's relationship with her live-in boyfriend. *Robinson*, 328 Md. at 511, 615 A.2d at 1192. We

rejected the father's custody petition and approved the trial court's finding that "[t]here was no indication that appellee's adulterous conduct had any adverse effect on her son." *Robinson*, 328 Md. at 520, 615 A.2d at 1196. In finding no abuse of discretion in the custody award, we reinforced the notion that unless actual or potential harm is shown the best interests standard requires disregard of a parent's non-marital relationship. Our finding was bolstered by the fact that the father was given "the opportunity to present his own evidence of any damaging impact of the appellee's adultery on their child." *Robinson*, 328 Md. at 518–19, 615 A.2d at 1196 (footnote omitted).

The *North* case involved a factual situation similar to the instant case, where the trial court restricted a homosexual father's overnight and extended visitation with his children. In holding that the trial court abused its discretion in restricting the visitation, based on the mother's fear that her ex-husband would inappropriately expose their children to his homosexual lifestyle, the court found that the chancellor was imprecise in her reasoning and never articulated how the father's non-marital relationship detrimentally affected his children. Regarding the mother's other fear, that the father's HIV status endangered their children, the court declared:

> "Although we do not believe that the court actually based its decision not to allow overnight visitation on Mr. North's HIV status, to the extent that the question resurfaces on remand, we would hold that a child's visitation with a non-custodial HIV-positive parent cannot be restricted on the basis of that parent's HIV status *unless the court finds that visitation without that restriction might endanger the child's physical health or impair his or her emotional development.*" (Emphasis added).

*North*, 102 Md.App. at 12 n. 2, 648 A.2d at 1030 n. 2.

Unlike *Swain*, *Queen*, *Robinson* and *North*, the cases of *Painter*, *John O.* and *Hanke*, discussed in Part III. A., *supra*, demonstrate that when a court does make a finding of actual or potential harm based on evidence and not presumption,

visitation with the parent can be legitimately restricted or denied. When the issue of abuse and/or neglect arises in a custody or visitation proceeding, a showing of actual or potential harm with specific findings is required pursuant to Maryland Code (1984, 1991 Repl.Vol.), Family Law Article, § 9-101, which provides:

"(a) *Determination by court.*—In any custody or visitation proceeding, *if the court has reasonable grounds to believe that a child has been abused or neglected* by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

(b) *Specific finding required.*—*Unless the court specifically finds* that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child." (Emphasis added).

 Thus, in restricting visitation, actual or potential harm is a component of the best interests standard and not a separate and distinct standard, as indicated in this State's case law and statutory code. We concur with the Court of Special Appeals in the instant case when it stated:

"The court in the case *sub judice articulated no findings of actual harm to the children* that the evidence indicated would result from the children's exposure to appellant's present or future non-marital sexual relationships, but inferred that such exposure would be *per se* harmful to the children by virtue of the relationship's inherently 'inappropriate' nature." (Emphasis in original and added).

*Boswell,* 118 Md.App. at 33, 701 A.2d at 1168.

### C. Other Jurisdictions

Maryland's coupling of the best interests of the child standard with actual or potential harm is in accordance with the case law of other jurisdictions, which requires evidence of

adverse impact before a parent's non-marital relationship can be a factor in custody or visitation decisions. Moreover, we agree with those courts from other jurisdictions that have held that the primary consideration in visitation and custody proceedings is not the sexual lifestyle or conduct of the parent, but whether the child will suffer harm from the behavior of the parent. Courts should adopt a flexible approach when confronting family law disputes, especially where children are involved. The court in *Conkel v. Conkel*, 31 Ohio App.3d 169, 509 N.E.2d 983, 985–86 (1987), advocated such an approach, stating:

> "Too long have courts labored under the notion that divorced parents must somehow be perfect in every respect.
>
> \* \* \*
>
> In domestic relations cases the courts should recognize that all parents have faults, and look not to the faults of the parents, but to the needs of the child. A child needs to know that both his parents, divorced or not, love him. Where the parent is removed from the child's environment, the child feels a sense of loss.... If the courts are concerned with the best interests of the child, then visitation by the non-custodial parent must be recognized as necessary to the child's well-being. *The denial of visitation should only be done when egregious conduct by the non-custodial parent results in harm to the child.*" (Emphasis added).

The following discussion of other states' case law on this issue is in line with the judgment of the Court of Special Appeals in *Boswell*, 118 Md.App. 1, 701 A.2d 1153 (1997). That is, before a parent's visitation may be restricted, the best interests of the child standard must be applied, coupled with the need for a factual finding based on evidence demonstrating that the non-marital partner's presence has adversely affected the children.

In *In re the Marriage of Birdsall*, 197 Cal.App.3d 1024, 243 Cal.Rptr. 287 (Cal.Ct.App.1988), a homosexual father was prohibited from exercising overnight visitation with his minor

son in the presence of any person known to be a homosexual. In finding the restraining order unreasonable, the California Court of Appeal applied a best interests standard stating: "[A]n affirmative showing of harm or likely harm to the child is necessary in order to restrict parental custody or visitation." *Birdsall,* 243 Cal.Rptr. at 290 (footnote omitted). The court found there was no affirmative showing of present harm to the child, nor any evidence of future detriment, due to the father's sexual orientation. "Evidence of one parent's homosexuality, without a link to detriment to the child, is insufficient to constitute harm." *Birdsall,* 243 Cal.Rptr. at 291. The court declared that "[u]nless it is shown that parental visitation would be detrimental to the best interests of the child, reasonable visitation rights must be awarded." *Birdsall,* 243 Cal. Rptr. at 289.

*Blew v. Verta,* 420 Pa.Super. 528, 617 A.2d 31 (1992), a Pennsylvania case, involved the restriction of a homosexual mother's visitation in the presence of her partner, allowing no contact between the child, Nicholas, and the paramour. In finding the trial court abused its discretion in concluding that the child was harmed by his mother's lesbian relationship, the reviewing court stated: "There is simply no evidence in the record of a causal link between the mother's homosexuality and Nicholas' acting-out behavior." *Blew,* 617 A.2d at 34. Applying the best interests standard concurrently with the need to find detriment to the "child's physical, emotional, and spiritual well-being" in order to restrict visitation, the court commented on Nicholas' adjustment to his mother's lifestyle:

> "Courts ought not to impose restrictions which unnecessarily shield children from the true nature of their parents *unless it can be shown that some detrimental impact will flow from the specific behavior of the parent.* The process of children's maturation requires that they view and evaluate their parents in the bright light of reality.
>
> \* \* \*
>
> In Nicholas' case, one of life's realities is that one of his parents is homosexual. *In the absence of evidence that the*

*homosexuality in some way harms the boy,* limiting Nicholas' relationship with that parent fails to permit him to confront his life situation, however unconventional it may be. . . . Nicholas' best interest is served by exposing him to reality and not fostering in him shame or abhorrence for his mother's nontraditional commitment." (Emphasis added).

*Blew,* 617 A.2d at 35–36 (quoting in part *Fatemi v. Fatemi,* 339 Pa.Super. 590, 489 A.2d 798, 801 (1985)). *See also Pleasant v. Pleasant,* 256 Ill.App.3d 742, 195 Ill.Dec. 169, 628 N.E.2d 633 (1993)(holding that lesbian mother's visitation could not be restricted solely on ground that she was in a lesbian relationship; sexual orientation of parent is relevant only if it directly harms the child);[4] *In re Marriage of Ashling,* 42 Or.App. 47, 599 P.2d 475 (1979)(holding that mother's visitation rights could not be limited by requiring that she not allow any lesbians in her home or around her children during their visits; there was no evidence in the record to justify the restrictions the trial court placed on the mother's visitation rights).

In a Washington State case, which also discussed the children's adjustment to their parents' separation and father's homosexual lifestyle, the trial court ordered that the father "shall not practice homosexuality in the sense of exhibiting, or participating in displays of affection . . . with a partner" in the presence of his children. *In re the Marriage of Wicklund,* 84 Wash.App. 763, 932 P.2d 652, 655 (1996). The appellate court found the trial court acted improperly in conditioning the father's visitation time on the requirement that he not "practice homosexuality." The court went on to state that parental rights cannot be limited because of a parent's sexual prefer-

---

**4.** Illinois uses a best interests standard to determine custody and the "endangerment standard" for visitation awards. Under the endangerment standard, which is more stringent than the best interests standard, a parent is entitled to visitation unless the visits would endanger the child. *See Pleasant v. Pleasant,* 256 Ill.App.3d 742, 195 Ill.Dec. 169, 628 N.E.2d 633, 640 (1993). Washington State also uses the endangerment standard in visitation proceedings. *See In re Marriage of Cabalquinto,* 43 Wash.App. 518, 718 P.2d 7 (1986).

ence and restrictions are only proper if the behavior " 'would endanger the child's physical, mental, or emotional health.' " *Id.* (quoting *In the Matter of the Marriage of Cabalquinto,* 43 Wash.App. 518, 718 P.2d 7, 8 (1986), which also dealt with a homosexual father's visitation rights being improperly restricted). In discussing the issue of the children's adjustment, the court stated: "[W]here the only harm is adjustment, the remedy is counseling, not restrictions on the parents' lifestyle in terms of sexual orientation." *Wicklund,* 932 P.2d at 653. For two other cases in which the court addressed the adjustment of children to their parents' homosexual lifestyle, *see Conkel,* 509 N.E.2d at 987 (stating "[t]he children will have to come to terms with the fact that their father is homosexual"); *M.P. v. S.P.,* 169 N.J.Super. 425, 404 A.2d 1256, 1262 (1979)(declaring "[h]ard facts must be faced.... [T]here is little to gain by creating an artificial world where the children may dream that life is different than it is.").

A Florida court in *Trylko v. Trylko,* 392 So.2d 1034 (Fla. Dist.Ct.App.1981), held that the trial court abused its discretion in restricting a mother's visitation with her children to times when her male paramour was not present. The appellate court found that, although the trial court applied the best interests of the child standard, it exercised moral disapproval of the mother's relationship rather than making factual findings based on evidence to support its conclusion that the paramour's presence during visitation had a "deleterious effect" on the children. *Trylko,* 392 So.2d at 1035. Without this evidentiary showing of harm, the court held that the order could not stand, stating: "The private lives of the children and the mother may not be so regulated." *Trylko,* 392 So.2d at 1036.

In another case dealing with a heterosexual non-marital relationship, the Supreme Court of Mississippi overturned a trial court order that restricted the non-custodial father from enjoying overnight visitation with his children because he lived with a woman without the cloak of marriage. *Harrington v. Harrington,* 648 So.2d 543 (Miss.1994). Applying the best

interests standard, the court found that the chancellor made no findings of fact supported by evidence in the record that the children were harmed by contact with the father's non-marital partner. *Harrington,* 648 So.2d at 546. *See Dunn v. Dunn,* 609 So.2d 1277, 1286 (Miss.1992)(stating overnight visitation of children with non-custodial parent is presumed and holding chancellor abused his discretion by restricting visitation where no evidence was presented that child was harmed or endangered by contact with non-custodial parent's paramour). *See also Chamblee v. Chamblee,* 637 So.2d 850, 862 (Miss.1994)(following *Dunn* holding in striking down order that mother could not have any male companion unrelated to her by blood or marriage present during visitation with her child; danger to children must be shown).

In a recent Georgia case, an appellate court held that in the absence of a finding of adverse effect on the child, unsupervised visitation with a homosexual father was in the best interests of the child. *In the Interest of R.E.W.,* 220 Ga.App. 861, 471 S.E.2d 6 (1996). As in the instant case, the lower court emphasized the father's lifestyle as morally undesirable, focusing on both non-marital heterosexual and homosexual relationships. *R.E.W.,* 471 S.E.2d at 8–9. The appellate court emphasized that the focus should be on likely harm to the child resulting from the parent's conduct, not a presumption as to how the parent's lifestyle may affect the child. *R.E.W.,* 471 S.E.2d at 9. Similarly, in *In re the Marriage of Walsh,* 451 N.W.2d 492, 493 (Iowa 1990), the Supreme Court of Iowa held that the trial court improperly restricted a homosexual father's visitation to times when "no unrelated adult" was present. The court found that "[t]his unusual provision was obviously imposed on account of [the father's] homosexual lifestyle." *Id.*

We also see adverse effect as a component of best interests of the child in cases involving custody disputes. In an Indiana case, a trial judge conditioned a mother's custody of her two sons upon her "not co-habitating with women with whom she is maintaining a homosexual relationship ... and ... not engaging in homosexual activity in the presence of the chil-

dren." *Teegarden v. Teegarden,* 642 N.E.2d 1007, 1008 (Ind. Ct.App.1994). The reviewing court applied a best interests standard and reversed the order, stating: "[H]omosexuality standing alone *without evidence of any adverse effect upon the welfare of the child* does not render the homosexual parent unfit as a matter of law to have custody of the child." *Teegarden,* 642 N.E.2d at 1010 (emphasis added)(footnote omitted). *See also Bezio v. Patenaude,* 381 Mass. 563, 410 N.E.2d 1207, 1215 (1980)(reversing the trial court finding that mother's lesbian household would create instability that would adversely affect the children's welfare, and thus custody should be granted to father); *Stroman v. Williams,* 291 S.C. 376, 353 S.E.2d 704, 705 (1987)(ruling that mother's lesbianism did not mandate a change in custody because there was no evidence that the child was adversely affected by it). For other custody and visitation cases dealing with presumptions of unfitness because of a parent's homosexuality, s*ee Bottoms v. Bottoms,* 249 Va. 410, 457 S.E.2d 102, 108 (1995)(stating "that a lesbian mother is not per se an unfit parent"); *Birdsall, supra* (holding that in a custody determination a parent is not presumed unfit because he or she is homosexual); *Conkel, supra* (finding father's homosexuality does not per se result in determination of unfitness so as to preclude overnight visitation rights absent evidence that visitation would be psychologically or physically harmful to children).

Thus, as all of the cases discussed *supra* demonstrate, and as the *Conkel* court so aptly states: "[W]hether the issue is custody or visitation, before depriving the sexually active parent of his crucial and fundamental right of contact with his child, a court must find that the parent's conduct is having, or is probably having, a harmful effect on the child."[5] 509

---

**5.** In addition to the cases discussed *supra,* the following custody and visitation cases also hold that a parent's sexual orientation is never contrary to the best interests of a child unless there is a nexus established between specific harm to the child and the parent's conduct: *State ex. rel Human Services Dep't,* 107 N.M. 769, 764 P.2d 1327 (N.M.Ct.App.1988); *M.A.B. v. R.B.,* 134 Misc.2d 317, 510 N.Y.S.2d 960 (N.Y.Sup.Ct.1986); *S.N.E. v. R.L.B.,* 699 P.2d 875 (Alaska 1985); *Gui-*

N.E.2d at 986. In a custody or visitation dispute, the question should be " '[w]hat is the effect of this parental behavior on the children?' *not*, '[i]s this behavior good or bad?' " *Grimes v. Grimes*, 281 Pa.Super. 484, 422 A.2d 572, 578 (1980)(Spaeth, J., dissenting)(emphasis added).

## D. Actual Harm and the Nexus Approach

As a starting point, it is important to keep in mind that a child is almost always benefitted by having the maximum opportunity to develop a close and loving relationship with both parents, especially in situations where the parents are separated or divorced. In determining which parent should be granted custody or how much visitation the non-custodial parent should be awarded, courts should not oversimplify the complex issues involved by speculating as to who is the better parent and concluding that this "better" parent should have total responsibility for the child. Such generalizing of the myriad issues at stake in custody and visitation proceedings does a great disservice to all the parties involved and will often result in a decision that is not in the best interests of the child.

 A child needs close contact with both parents, and visitation with the non-custodial parent must be as liberal as

*nan v. Guinan*, 102 A.D.2d 963, 477 N.Y.S.2d 830 (N.Y.App.Div.1984); *Doe v. Doe*, 16 Mass.App.Ct. 499, 452 N.E.2d 293 (1983); *Nadler v. Superior Court*, 255 Cal.App.2d 523, 63 Cal.Rptr. 352 (1967).

The following cases deal specifically with the impact of the heterosexual non-marital relationship of one parent on the children, where the other parent moved for a modification in custody or visitation on the basis that the relationship was harming the children. In all of these cases, the court denied the proposed change on the basis that no findings of harm or detriment to the children were found. Although these cases deal with a heterosexual non-marital relationship, the "actual harm" holdings are equally applicable to cases involving homosexual relationships. *See Schwantes v. Schwantes*, 121 Wis.2d 607, 360 N.W.2d 69 (Wis.Ct.App.1984); *Moreau v. Moreau*, 422 So.2d 734 (La.Ct. App.1982); *Smith v. Smith*, 396 So.2d 252 (Fla.Dist.Ct.App.1981); *In re Marriage of Wellman*, 104 Cal.App.3d 992, 164 Cal.Rptr. 148 (1980); *Draper v. Draper*, 403 So.2d 989 (Fla.Dist.Ct.App.1980); *In re Marriage of Walter*, 27 Or.App. 721, 557 P.2d 57 (1976); *Seldin v. Seldin*, 55 Misc.2d 187, 284 N.Y.S.2d 679 (N.Y.Sup.Ct.1967).

reasonably practicable, taking into account the need for stability in the children's school and home schedules, the parents' respective work schedules, and how far apart the two parents live from each other, among other factors. Visitation should only be denied in cases of abuse, neglect or harm to the child, as evidenced by a specific showing of detriment. We also want to reiterate that the case law discussed in this opinion concerning custody determinations, and the principles governing such situations, are equally applicable to visitation proceedings. This Court agrees with the Court of Special Appeals when it stated:

> "This necessary focus on the welfare of the children, rather than on the rights of the parent, dictates that we apply *Davis* and *Swain* [cases cited *supra* ] in the context of visitation awards. Because children spend less time visiting with a non-custodial parent than living with a custodial parent, a child probably would suffer less harm by visiting with a parent living in a non-marital relationship than by living with one in such a relationship. To allow an inference of harm to the child in a visitation context while prohibiting such an inference in the custody context would not promote the goal of protecting the child's best interests."

*Boswell,* 118 Md.App. at 33, 701 A.2d at 1168–69.

After reviewing Maryland case law on this issue and also surveying the case law of other states, we now clarify the standard a court should apply in determining the extent of restrictions on parental visitation of children in the presence of non-marital partners. As evidenced by 20 years of cases from this Court, the Court of Special Appeals, and the rulings in the majority of other states, there is no conflict between the best interests of the child standard and the requirement of an evidence-based finding of adverse impact on the child caused by a parent's non-marital relationship to justify restrictions or limitations on custody or visitation.

In all family law disputes involving children, the best interests of the child standard is always the starting—and ending—point. We see no reason to deviate from this

standard here. When we narrow the focus to proceedings involving proposed visitation restrictions in the presence of non-marital partners, courts also are to examine whether the child's health and welfare is being harmed. Once a finding of adverse impact on the child is made, the trial court must then find a nexus between the child's emotional and/or physical harm and the contact with the non-marital partner. If no clear, direct connection is found, then the non-custodial parent's visitation rights cannot be restricted.

 We want to emphasize that the above formulation does not require a court to sit idly by and wait until a child is actually harmed by liberal unrestricted visitation. If there is sound evidence demonstrating that a child is likely to be harmed down the road, but there is no present concrete finding of harm, a court may still consider a child's future best interests and restrict visitation. The need for a factual finding of harm to the child requires that the court focus on evidence-based factors and not on stereotypical presumptions of future harm.

Therefore, before a trial court restricts the non-custodial parent's visitation, it must make specific factual findings based on sound evidence in the record. If the trial court does not make these factual findings, instead basing its ruling on personal bias or stereotypical beliefs, then such findings may be clearly erroneous and the order may be reversed. In addition, if a trial court relies on abstract presumptions, rather than sound principles of law, an abuse of discretion may be found.

Finally, the actual harm and nexus approach we outline today regarding visitation restrictions in the presence of non-marital partners applies to both heterosexual and homosexual relationships. We make no distinctions as to the sexual preference of the non-custodial parent whose visitation is being challenged. The only relevance that a parent's sexual conduct or lifestyle has in the context of a visitation proceeding of this type is where that conduct or lifestyle is clearly

shown to be detrimental to the children's emotional and/or physical well-being.

### E. The Nexus Approach as Applied to This Case

In applying the nexus approach outlined in Part III. D., *supra,* while keeping in mind that a child's best interests are virtually always served by close contact with each parent, we find no clear, direct connection between the presence of Mr. Donathan and actual or potential harm to either Ryan or Amanda that justifies restricting Mr. Boswell's parental visitation. Indeed, the trial court made no evidentiary findings of detriment to either child, much less demonstrating that the alleged harm could be traced to Mr. Donathan's presence during visitation. Neither Ms. Kabriel nor Dr. Standley testified to the existence of any adverse impact on the children, mentioning only that Ryan was not comfortable around Mr. Donathan. They made no mention of Amanda being uncomfortable or upset with her father's partner. This, without more, does not come close to a finding of actual harm to the children that should result in Mr. Boswell's visitation being restricted.

Also critical to our finding of no adverse impact on the children was that no key party in this case, including Ms. Boswell, Ms. Kabriel, and Dr. Standley, asked the trial court to restrict Mr. Boswell's visitation in any manner. Instead, the trial court acted on its own initiative, seemingly influenced by its own biases and belief that Mr. Boswell's relationship with Mr. Donathan was "inappropriate." Both Ms. Kabriel's and Dr. Standley's testimony is consistent regarding what the visitation parameters should be regarding Mr. Boswell and his children, with neither suggesting any restrictions much less the recommendation that there be no visitation in the presence of Mr. Donathan. In *Davis* and progeny, discussed in Part III. B., *supra,* we overturned the power of a trial court to use such blanket disapproval of a non-marital relationship as a basis for determining custody or visitation without a finding of adverse impact on the children.

Ms. Boswell has strongly urged that her children's preference not to visit with Mr. Donathan be considered, namely Ryan's desire not to spend the night at his father's home. While we have stated that a court can consider a child's preference in custody and visitation determinations, Ryan's *in camera* statements to the trial judge regarding visitation in the presence of Mr. Donathan were unclear and did not demonstrate ample maturity and judgment to make a reasoned decision on this issue.[6]

In short, because the trial court made no factual findings that evidenced actual or likely future harm to Ryan or Amanda due to contact with Mr. Donathan and it also appeared to consider the factor of Mr. Boswell's non-marital relationship to the exclusion of all others, the Court of Special Appeals was correct in vacating the visitation order. The only factual finding that the trial court made was that Dr. Standley suggested overnight visitation was inappropriate. The Court of Special Appeals held this finding clearly erroneous, as discussed in Part I., *supra*.

Thus, while this Court sympathizes with the difficult adjustment these children may be having with not only their parent's divorce, but also with their father's homosexual lifestyle, it has not been shown to be in Ryan and Amanda's best interests to curtail visitation so as to restrict Mr. Donathan from their lives. " 'Learning to cope with new adults and the disrupting effects of visitation schedules are the unavoidable consequences of divorce.' " *Robinson*, 328 Md. at 512, 615 A.2d at 1192 (quoting trial judge's memorandum). The reality

---

**6.** "Although a child may volunteer such information, a child probably should not be asked directly to express his or her preferred decision in the case. By carefully choosing and phrasing the questions, a judge should be able to determine the parent with whom the child would choose to reside, whether or not a child would like to visit with the noncustodial parent, and the conditions attaching to custody and visitation. Asking the child directly for his or her preference at least gives the appearance of shifting the decision-making burden from the judge to the child, a result to be avoided." Cathy J. Jones, *Judicial Questioning of Children in Custody and Visitation Proceedings*, XVIII FAMILY LAW QUARTERLY 43, 89 (Spring 1984).

is that their father is a homosexual who shares his home and life with Mr. Donathan. As Ms. Kabriel stated, Mr. Donathan is not going to simply "go away," even if Ryan and Amanda may wish it so. There is a maxim, enunciated by the Supreme Court, that parents are presumed to act in their children's best interests. *Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 118 (1979).

## IV.

For the reasons stated, we affirm the judgment of the Court of Special Appeals and hold that the correct standard to be applied is the best interests of the child, with liberal visitation being restricted only upon a showing of actual or potential adverse impact to the child resulting from the contact with the non-marital partner. In the instant case, because no factual findings were made as to likely harm to Ryan or Amanda, there can be no nexus between such harm and the presence of Mr. Donathan during visitation. Thus, the order requiring Mr. Donathan to be absent when Petitioner is exercising his visitation rights with his children is vacated.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REMAND THIS CASE TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

CATHELL, J., concurs.

CATHELL, Judge, concurring.

I concur with the result reached by the Court.

Because I view the trial judge's decision in *North v. North* to have been correct based on, as it was, her opinion that Mr. North could not be trusted to keep his children from harm, an opinion supported by strong evidence of prior untrustworthy

conduct by Mr. North, I do not believe the factual situation in the instant case is similar to that in *North*. I cannot join the majority in its reasoning that the two cases are similar. It is because I perceive a different pattern of conduct by Mr. Boswell that I concur in the result in the instant case. Simply stated, Mr. Boswell does not appear to be a Mr. North.